Morton GLOBUS et al., Plaintiffs,

v.

LAW RESEARCH SERVICE, INC. and Ellias C. Hoppenfeld, Defendants.

BLAIR & CO., Granbery, Marache Incorporated, Defendant and Third-Party Plaintiff,

v.

Paul WIENER, Third-Party Defendant.

No. 65 Civ. 1694.

United States District Court
S. D. New York.

July 2, 1968.

Cooper, Ostrin, DeVarco & Ackerman, New York City, for plaintiff.

Julien, Glaser & Blitz, New York City, for defendants Law Research Service, Inc., Hoppenfeld and Wiener.

Nixon, Mudge, Rose, Guthrie, Alexander & Mitchell, New York City, for defendant Blair & Co., Granbery, Marache, Inc.

MANSFIELD, District Judge.

In this action by 13 purchasers of an issue of common stock of Law Research Service, Inc., the complaint charged Elias C. Hoppenfeld, its President, and Blair & Co., Granbery, Marache Inc., the underwriter of the issue, in three counts with violations of § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and common law fraud, and Blair & Co. in two counts with violation of § 12(2) of the 1933 Act and § 15(c) of the 1934 Exchange Act. The jury awarded compensatory damages against all defendants on all counts except the common law fraud counts (as to which it returned a verdict for the defendants) and punitive damages against Hoppenfeld and Blair & Co. on the count charging them with violation of § 17(a) of the 1933 Act.

Cross-claims were also asserted under an indemnity agreement by defendants Law Research Service, Inc. and Hoppenfeld against Blair & Co., and by Blair & Co. against them and a third party defendant, Paul Wiener. Disposition of these cross-claims was deferred pending the jury's verdict, following which the said defendants and third party defendant moved to dismiss the cross-claims. Reserving decision on that motion, this Court submitted the issue of liability on the cross-claims to the jury which found against Law Research Service, Inc. and Hoppenfeld, and in favor of Blair & Co., whereupon Law Research Service, Inc., Hoppenfeld and Wiener moved, pursuant to Rule 50(b), F.R.Civ.P., to set aside the verdict and for judgment notwithstanding the verdict. For the reasons hereafter set forth, the motions of the said defendants are granted.

The lawsuit arises out of a public offering of 100,000 shares of the common stock of Law Research Service, Inc. pursuant to a Regulation A exemption from registration, in connection with which an Offering Circular admittedly prepared by the defendants and bearing the name of Blair & Co. was distributed to the public. Law Research Service, Inc., which commenced operations in 1964, was engaged in the business of operating a law information retrieval program for the legal profession by applying computer technology to the problems of legal research. In order to carry out its operations, it entered into an exclusive five-year contract, dated June 5, 1963, with the Univac Division of the Sperry Rand Corporation, which obligated Sperry Rand to provide programming, Sperry Rand's Univac III computer time, and certain other services, all at costs set forth in the contract.

In offering the new issue on March 15, 1965 to the public, the Offering Circular referred prominently (on page 5) to "the Sperry Rand contract", which was obviously an attractive feature to the public, since the name Sperry Rand is widely known to the public as a leader in the computer field. Although the Circular described in several paragraphs the Sperry Rand Law Research contract, it misrepresented the relations between the two companies under the contract by omitting mention of the fact that on January 25, 1965, Sperry Rand had written a letter to Law Research terminating the contract effective January 29, 1965 for non-payment of a balance of more than $82,000. The Circular also omitted mention of the important fact that following the termination letter Law Research had instituted a lawsuit in the New York County Supreme Court against Sperry Rand by service of summons upon it and various of its officials and on February 23, 1965, it filed in that lawsuit an affidavit sworn to by its Treasurer and Director, Wiener, swearing that the lawsuit was for breach of contract, fraud and deceit, specific performance and conspiracy. Lastly the Offering Circular

omitted entirely any mention of the equally material fact that from January 29, 1965 until at least the date of the Offering Circular (March 15, 1965), and for sometime thereafter, Sperry Rand was refusing to furnish vital services to Law Research pursuant to the contract.

The plaintiffs testified that they purchased shares of the new issue of Law Research stock in reliance upon the description of the contract with Sperry Rand, a name which many of them knew favorably as a national concern, and that they would not have purchased their stock if they had known of the termination, lawsuit and refusal to furnish services, since the contract with Sperry Rand was understandably viewed by them as a very important factor in leading them to buy Law Research stock.

██ In addition to seeking compensatory damages the complaint sought punitive damages against all of the defendants, alleging that they had acted fraudulently, wantonly and with reckless disregard for the consequences of their conduct and that they had committed a gross fraud, involving high moral culpability that was aimed at the public generally. Judged by such well-established criteria there was ample evidence to support an award of punitive damages against Hoppenfeld and Blair & Co. There is no dispute about the fact that Hoppenfeld was fully aware of the termination letter, the lawsuit and Sperry Rand's refusal to render services, and that he omitted these most material facts from the Notification and Offering Circular, obviously for the reason that if the facts had been revealed to the public, it might have been difficult, if not impossible, to induce the public to invest in the new issue. Although Hoppenfeld was undoubtedly the primary wrongdoer, there was ample evidence in the record to support a finding that Blair & Co. also had knowledge of the essential, material facts omitted from the Offering Circular and was guilty of deliberate wrongdoing in distributing the Circular without revealing these facts. Hoppenfeld testified, for instance, that he furnished the essential facts both to Blair & Co. and Arthur Young & Co., Certified Public Accountants, who were brought by it into the picture to conduct the audit and handle accounting matters in connection with the new issue.*

Although Hoppenfeld at trial first indicated reluctance to implicate Blair & Co., he did eventually testify flatly that in February 1965 he advised Mr. Sanders of Blair & Co., who was in charge of the issue, about the lawsuit that had been begun on January 29, 1965 against Sperry Rand. (See stenographic minutes, pages 145 to 149) In addition to such direct testimony, there was considerable evidence from which an inference of knowledge on Blair & Co.'s part could be drawn, including repeated references to a lawsuit in February 1965 correspondence between Hoppenfeld and Arthur Young & Co. and specific references in such correspondence and communications to the Sperry Rand termination letter of January 25, 1965.

In view of the fact that there was evidence from which an inference of fraudulent, wanton and willful misconduct involving high moral culpability and disregard for the public could be drawn, Walker v. Sheldon, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961); Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2d Cir. 1967); Smith v. Little, Brown & Co., 273 F.Supp. 870 (S.D.N.Y.1967), the Court submitted to the jury the question of whether punitive damages should be awarded. In its original charge the Court instructed the jury that such damages could be awarded only for conduct deemed to be against the public interest which involved high moral culpability and acts that were the result of gross fraud. (See Appendix A hereto) Walker v. Sheldon, 10 N.Y.2d 401, 405,

---

* Arthur Young & Co. were accountants for both Blair & Co. and its law firm in charge of the handling of the underwriting, Nixon Mudge Rose Guthrie Alexander & Mitchell.

223 N.Y.S.2d 488, 179 N.E.2d 497 (1961) At the time when these instructions were given, there was submitted to the jury not only the claims based on alleged violations of §§ 12(2) and 17(a) of the 1933 Act and §§ 10(b) and 15(c) of the 1934 Act, but also a count charging common law fraud in violation of New York law.

During the course of its deliberations, the jury sent out a note inquiring whether it must find common law fraud in order to award punitive damages. The Court then instructed the jury as follows:

"I have already instructed you that punitive damages are intended to penalize or punish a defendant for certain kinds of conduct deemed to be against the public interest which involve a high moral culpability.

"Now, the standard for determining whether or not punitive damages should be imposed in any case such as this is not whether the technical requirements of common law fraud as distinguished from Federal Securities Law fraud are established, the standard is whether the conduct of a defendant involved a high degree of moral culpability of a type that would in effect constitute moral turpitude or dishonesty and a wanton indifference to one's obligations.

"Now, having that standard in mind, it, of course, would be much more likely that one would have to find an intent to defraud in order to find any punitive damages. However, I pointed out that there was one other difference between common law fraud and the Federal Securities Act fraud and that is that the reliance is slightly different. The reliance under common law fraud has to be what is called justifiable reliance as distinguished from the standard that I mentioned earlier, which was whether or not the plaintiff, if he had known the omitted facts, would have been likely to take a different course of action or whether the plaintiff would have been influenced to act differently than he did act if the defendants had disclosed to him the omitted facts.

"Punitive damages are not recoverable under one of the Securities Acts involved, known as the 1934 Act. However, there is nothing to preclude recovery of them in a suit under the other Federal Security Act known as the 1933 Act.

"So what I am saying to you is that while it would be much more likely that you would have to find an intent to defraud before you could find punitive damages, that is not an absolute requirement. The test is whether there is high moral culpability or such gross fraud and deceit upon the public that it shows, evinces, what somebody has described as moral turpitude or such a wanton dishonesty as to imply an indifference to one's obligations.

"I think that is the best I can give you on this subject. If it is inadequate, you may request more and I will do my best."

There followed a verdict against the defendants on all charges of violation of the federal securities laws and a verdict in favor of the defendants on the count charging common law fraud. Defendants' motion to dismiss the award of punitive damages against Hoppenfeld and Blair & Co. on the ground that such damages could not be awarded in a civil suit for violation of the federal securities laws was denied. Although § 28(a) of the 1934 Exchange Act, 15 U.S.C. § 78 bb(a) prohibits an award of damages "in excess of * * * actual damages on account of the act complained of", no such prohibition is found in the 1933 Act. Congress' decision thus to limit the prohibition to the 1934 Exchange Act appears to have been deliberate. It could, of course, have added a similar provision to the 1933 Act, but it chose not to do so. One reason was that in adopting the 1934 Exchange Act it was faced with a unique problem not encountered in the earlier law. Since the 1934 Exchange Act was to apply only to post-distribution trading of securities listed on national exchanges,

issuers could avoid its provisions, at least as far as new issues were concerned, simply by not listing them on such exchanges. In order to avoid such a "strike" Congress imposed less burdensome requirements and standards in the 1934 Exchange Act upon issuers than those found in §§ 11 and 12 of the 1933 Act, which could not easily be avoided by issuers, since the 1933 Act dealt with the distribution of securities, whether or not listed on an exchange, through use of the mails, telephone or any interstate instrumentality or facility. The selective and limited applicability of § 28 (a) of the 1934 Exchange Act was part and parcel of this legislative design.

■ There remains the question of whether fraud in violation of § 17(a) of the 1933 Act should be treated differently, at least for purposes of permitting imposition of punitive damages, than traditional common law fraud. The mere fact that liability arises out of a statutory violation does not require express legislative authority permitting such damages. Mansell v. Saunders, 372 F.2d 573, 576 (5th Cir. 1967) (punitive damages recoverable in action under Civil Rights Act § 1983); Basista v. Weir, 340 F.2d 74, 84–88 (3d Cir. 1965); In re Den Norske Amerikalinje A/S, 276 F.Supp. 163, 176 (N.D.Ohio 1967) (punitive damages recoverable in action under Jones Act); but see Burris v. International Brotherhood of Teamsters etc., 224 F. Supp. 277 (W.D.N.C.1963) (punitive damages not recoverable under Labor-Management Reporting and Disclosure Act). In fact there are not even express statutory provisions creating civil liability, much less authorizing an award of compensatory damages in a civil suit based on a violation of § 17(a). Yet the violation of that section, like a violation of § 10(b) of the 1934 Exchange Act, is recognized as giving rise, under basic common law tort principles, to civil liability in favor of those intended to be protected by the statute—in this case the victims of the fraud—and to be awarded damages. Dack v. Shanman, 227 F.Supp. 26, 28–29 (S.D.N.Y.1964);

Thiele v. Shields, 131 F.Supp. 416, 419 (S.D.N.Y.1955); III Loss, Securities Regulation 1784–91 (1961 ed.); Bromberg, Securities Law Fraud ¶ 2.5(1) n. 105. The right of the victims to sue, and to be awarded damages, is implied, not expressed in the statute itself.

To award compensatory damages for violation of § 17(a), the jury was instructed that it must find that the defendants made (1) false or misleading statements (2) with respect to material facts (3) with knowledge that the statements were false or misleading, or of the existence of facts which, if disclosed, would reveal them to be false or misleading, and that (4) the plaintiffs relied upon the statements as substantial factors in determining their course of conduct (as distinguished from "justifiable" reliance) (5) with resulting damage. The jury was further instructed that if, in addition to these elements it found that the fraudulent conduct involved a "high degree of moral culpability," "wanton dishonesty," "moral turpitude," "gross fraud and deceit upon the public," and a "wanton indifference to one's obligations," punitive damages might be awarded in addition to compensatory damages. Since there was evidence to support such findings and we must at this stage assume that the jury so found, the nature of the conduct appears to be appropriate for such an award under § 17(a) of the Securities Act of 1933. See Nagel v. Prescott & Co., 36 F.R.D. 445 (N.D.Ohio 1964), but see Shonts v. Hirliman, 28 F.Supp. 478 (S.D.Cal.1939).

An award of punitive damages as a means of deterring fraudulent conduct of a heinous character, such as was found by the jury here, also accords with the overall purpose of the anti-fraud provisions of the 1933 Act. In enacting that statute Congress declared war upon practices that would deceive investors, and to this end equipped the Securities and Exchange Commission, the Department of Justice, and the investing public with an arsenal of legal weapons designed to instill honesty and fair dealing among issuers, underwriters, dealers and others

who issued, distributed and traded in securities. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1964); Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 182 (1933). With a view toward effectuating these broad remedial purposes, the judiciary has endeavored to answer the multitude of not specifically resolved questions that arise under these enactments. See, e. g., J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); SEC v. Capital Gains Research Bureau, Inc., supra.

▇ In addition to deterring fraud generally in the sale of securities, punitive damages serve the desirable function, certainly in cases involving limited amounts of compensatory damages (such as that here) of insuring that victims of a scheme to defraud who purchased only a small number of shares pursuant to a Regulation A offering (100,000 shares or less) will not find themselves without an effective legal remedy. Compare Missouri Pac. Ry. Co. v. Humes, 115 U.S. 512, 523, 6 S.Ct. 110, 29 L.Ed. 463 (1885). Moreover, as Judge Fuld put it in Walker v. Sheldon, 10 N.Y.2d at 406, 223 N.Y.S.2d at 492, 179 N.E.2d at 499, limiting the judgment to compensatory damages

> "would require the offender to do no more than return the money which he had taken from the plaintiff. In the calculation of his expected profits, the wrongdoer is likely to allow for a certain amount of money which will have to be returned to those victims who object too vigorously, and he will be perfectly content to bear the additional cost of litigation as the price for continuing his illicit business. It stands to reason that the chances of deterring him are materially increased by subjecting him to the payment of punitive damages."

See Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (2d Cir. 1951).

▇▇ Defendants contend that since the jury found for the defendants on the common law fraud claim, punitive damages could not be awarded against them for violation of § 17(a) of the Securities Act of 1933. This would require that a plaintiff establish (1) justifiable reliance, necessary in a common law deceit action, rather than the federal securities law fraud's actual reliance test, i. e., that plaintiff would have been influenced to act differently than he did if the defendant had disclosed the omitted fact; and (2) a specific "intent to defraud" as distinguished from actual knowledge of a statement's material falsity or of facts showing it to be false or misleading, notwithstanding the existence of a general fraudulent purpose aimed at the public as a whole, or wanton and reckless conduct evidencing a deliberate disregard for one's own obligations or the interest of others. However, as already noted, the concept of punitive damages has never been so narrowly limited. Its purpose is to deter and punish a wide range of anti-social conduct, including not only intentional wrongs (e. g., assault, defamation, seduction), but also wanton and reckless conduct, such as drunken driving that injures another, Miller v. Blanton, 213 Ark. 246, 210 S.W.2d 293, 3 A.L.R.2d 203 (1948), the maintenance of a nuisance, Reynolds Metals Co. v. Lampert, 316 F.2d 272, 275 (9th Cir. 1963), defamation, Penn-Ohio Steel Corp. v. Allis Chalmers Mfg. Co., 50 Misc.2d 860, 272 N.Y.S.2d 266, 289–290 (Sup.Ct., N.Y.Co., 1966), the unreasonable refusal to sell a ticket, Pittsburgh, C. & St. L. Ry. Co. v. Lyon, 123 Pa. 140, 16 A. 607, 2 L.R.A. 489 (1889), see McCormack, Damages §§ 79, 81 (1935), or fraud Walker v. Sheldon, supra. Although an "intent to defraud" i. e., a design to "cheat" or to "hoodwink," or to deprive another of something of value, see Weber v. C. M. P. Corp., 242 F.Supp. 321, 324–325 (S.D. N.Y.1965), will support a verdict of punitive damages, there are also others that will suffice. For example, where a defendant brazenly embarks on a venture to reap profits on the basis of a knowing false statement, unmindful of consequences to others, he too may be held

liable for punitive damages despite his absence of a specific intent to cheat a particular person. Walker v. Sheldon, supra (puntive damages may be awarded against one who has deliberately and wantonly engaged in a far-flung fraudulent scheme, systematically conducted for profit). Whether the victim is a gullible innocent or a shrewd investor is not terribly significant in judging the character of conduct on a defendant's part that should be deterred. Therefore, provided plantiff can establish wanton dishonesty, high moral culpability and a gross fraud aimed at the public generally, as he has done here, punitive damages can be awarded for violation of § 17(a) of the 1933 Act, even in a case in which plaintiff has not brought himself within the technical elements of common law deceit. Moreover, there is no merit in the assertion that the Court's instruction departed from "the close to criminal" standard, since the substance of the charge repeatedly brought out that defendants' conduct had to involve high moral culpability and wanton dishonesty.

■ A third contention is that since plaintiffs maintained their action for violation of § 10(b) of the 1934 Act, they gave up any right to recover anything in excess of actual damages. They base their argument upon § 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a) which provides that "[n]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of." Since the defendants' acts which brought forth the § 17 (a) claim were identical to those which led plaintiffs to sue under § 10(b) of the 1934 Act, so the argument runs, plaintiffs, having been permitted to sue under the 1934 Act must be limited in their recovery to "actual damages," i. e., no punitive damages.

While the contention is an interesting one, defendants' position cannot succeed because it overlooks the first clause of § 28(a) which provides:

"The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity * * *."

This clause has as its purpose to insure that the 1934 Act creates *additional* rather than exclusive remedies to those who have been victimized and misled in the purchase of securities. Errion v. Connell, 236 F.2d 447 (9th Cir. 1956). Among the other remedies available to such plaintiffs is a common law deceit action and an action based on violation of § 17(a) of the 1933 Act, with their possibilities of punitive damages.

■ Defendants' position, if accepted, would force plaintiffs, either prior to or during litigation, to choose between common law remedies with their different proof requirements, and § 10(b) and Rule 10b. While a defrauded purchaser could avoid these difficulties by keeping free of the 1934 Act and joining a common law fraud claim with one under § 17(a) of the 1933 Act, 15 U.S.C. § 77q (a), a defrauded seller would not be so fortunate, because § 17(a) is not available to one in his position. Such a result would resurrect from the depths the long-since repudiated "election of remedies" doctrine. See Clark, Code Pleading § 77 (1947). This Court is loathe to believe that Congress, in enacting the 1934 legislation, intended to create such a procedural morass for those victimized by securities frauds. Moreover, the one case where the issue was presented rejected such a contention. Gann v. Bernzomatic Corp., 262 F.Supp. 301, 304 (S.D. N.Y.1966) (McLean, J.). In the light of the foregoing, the second clause of § 28 (a), 15 U.S.C. § 78bb(a), should be read only as indicating that in no event shall double compensatory damages be recovered by reason of the fact that plaintiff alleges alternative theories for relief, III Loss, Securities Regulation 1474 n. 105 (1961 ed.); and that punitive or exemplary damages are not recoverable for violation of the Securities Exchange Act of 1934. Meisel v. North Jersey Trust Co., 218 F.Supp. 274, 216 F.Supp. 469

(S.D.N.Y.1963); Pappas v. Moss, 257 F. Supp. 345 (D.N.J.1966).

■ Defendants also argue that since the jury's verdict did not distinguish between the § 17(a) claim under the 1933 Act, and the § 10(b) count under the 1934 Act, the punitive damages award cannot stand. This contention borders on the frivolous for the reason that the elements of both causes of action are the same in a case involving a defrauded purchaser, so that the jury, in finding a violation of § 17(a), necessarily found one of § 10(b). Furthermore, the Court charged that punitive damages could be awarded only for violation of the 1933 Act, and not for the 1934 Act, see Bromberg, Securities Law Fraud § 9.1 n. 20, and the jury found all securities acts to have been violated. The defendants were therefore not prejudiced by lumping of the verdicts based on violation of the federal securities acts.

It is significant, in reviewing defendants' contentions as to punitive damages, that when faced with a gross securities fraud aimed at the public generally, the jury leniently assessed such damages, including counsel fees, in a total amount of $26,800 as against Hoppenfeld, and $13,-000 as against Blair & Co., while finding compensatory damages in the amount of $27,600. Moreover, the jury sensibly refused to assess punitive damages against defendant Law Research, apparently for fear that plaintiffs might gain at the expense of other stockholder-victims who neglected to pursue their claims.

Defendants next contend that the instruction given with respect to the knowledge necessary to support an action under § 17(a), § 10(b) and Rule 10b–5 was in error. The Court charged that the jury had to find that

"[T]he defendant either knew that the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it [the statement] to be misleading."

In short, actual knowledge of the misleading nature of the statement was an essential to liability. However, defendants say that more is required, and that the jury should have been required to find not only that the defendants had knowledge of the falsity of their statements, but also that they had an intent to deceive, to cheat, and to hoodwink.

At the moment, this is an issue which has caused considerable debate among the judges in this district as well as among the solons of academia. Compare Gould v. Tricon, Inc., 272 F.Supp. 385 (S.D.N.Y.1967) (Tenney, J.) (fraudulent conduct essential) and Weber v. C. M. P. Corp., 242 F.Supp. 321 (S.D.N.Y.1965) (Wyatt, J.) (deception in the sense of "cheating" or "hoodwinking" essential) with Richland v. Crandall, 262 F.Supp. 538, 553 n. 12 (S.D.N.Y.1967) (myself) (guilty knowledge will suffice), and with Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y.1964) (McLean, J.) (irrespective of defendant's intent, allegation of untrue material statement or material omission withstands motion to dismiss). As to the debate among the academicians, compare Cohen, "Truth in Securities" Revisited, 79 Harv.L.Rev. 1340, 1364–66, 1369–70 n. 89 (1966) ("manipulative" or "deceptive" conduct should be prerequisite); III Loss, Securities Regulation 1766 (1961 ed.) (watered-down *scienter* element); Jennings, Insider Trading in Corporate Securities, 62 Nw.L.Rev. 809, 818–19 (1968) (scienter essential except where plaintiff and defendant are fiduciaries); Note, Civil Liability under Section 10B and Rule 10B–5, 74 Yale L.J. 658, 682–90 (1965) (liability for negligent, though not innocent, misstatements suggested).

■ Thrust as we are into the fray, it appears to us inescapable that an implied private civil action under § 10(b) requires the existence of at least "manipulative" or "deceptive" conduct or a "contrivance" in order to fall within the congressional mandate. Moreover, while § 17(a) (2) proscribes *any* untrue statement of a material fact or omission to state a material fact, regardless of the maker's intent, it does not appear inappropriate to require that a private plaintiff demonstrate something more than a

negligent misstatement, in view of the existence of §§ 11 and 12(2), 15 U.S.C. §§ 77k and 77*l*(2) which in effect proscribe negligent misstatements in the sale of securities. Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951).

The question therefore comes down to whether actual knowledge of the misstatement alone is sufficient or whether, in addition, this knowledge must be coupled with intent to defraud. Support for the view that intent to defraud is unnecessary can be gleaned from the legislation itself. First, the action of deceit and its requisites have deep roots in the common law, see, e. g., Pasley v. Freeman, 3 Term Rep. 51, 100 Eng.Rep. 450 (1789); Prosser, Torts 699–700 (3d ed. 1964), it seems reasonable, in light of this history, to infer that if Congress had desired to use an "intent to defraud" concept in these sections of the securities acts, it merely had to refer to time-honored classic phrases which were quite familiar, see The Mail Fraud Statute, 18 U.S.C. § 1341. Instead, words referring primarily to conduct, but implying premeditation with a view to gain at the expense of others, were employed, such as "manipulative . . . device" or "contrivance." Second, the criminal penalties visited upon one who files a false and misleading statement only require wilfulness and intentional conduct, but do not require an intent to defraud, 15 U.S.C. §§ 77yyy, 78ff. To impose upon the civil plaintiff the burden of demonstrating intent to defraud when no such burden is imposed upon the Government in a related criminal case arising out of the same statement or document would create an anomolous result. Since the statutes in question, §§ 17(a) and 10(b), do not force one to this rather odd conclusion, they should not be so read. See III Loss, Securities Regulation 1442 n. 45, 1766 (1961 ed.). Therefore the Court rejects defendants' contentions that intent to defraud is an essential element of a private cause of action under §§ 17(a), 10(b) and Rule 10b–5.

Defendants also contend that there is an absence of evidence to demonstrate that plaintiffs' economic loss was caused by reason of the false and misleading Offering Circular. They contend that the drop in prices following disclosure of the dispute on April 21, 1965 may have been attributable to factors unrelated to misrepresentations in the Offering Circular. However, the parties, in response to an inquiry by the Court, agreed, assuming liability was established, that the damages suffered by plaintiffs by reason of the Offering Circular would be the difference between the purchase price less the sale price, subject to a duty on the part of each plaintiff to mitigate (Charge p. 42). As a result, defendants are estopped from now contending that the damages caused by reason of the false and misleading Offering Circular are different from the amounts so stipulated. Moreover, in view of Law Research's price movements coupled with the dates of the disclosure of the material information omitted from the Offering Circular, there was ample evidence to support the inference that the drop in the stock prices was brought about by revelation of the dispute. Certainly when viewed in the light of the materiality of the Sperry Rand contract to Law Research these damages were foreseeable and within the contemplation of the defendants.

Turning to the cross-claim by Blair & Co. against the other defendants and Wiener, Blair's claim against Law Research is founded on paragraph 9 of the underwriting agreement which obligated Law Research to indemnify Blair & Co. for any loss arising out of any untrue statement of a material fact in the Offering Circular, except that Blair was not to obtain indemnification by reason of any willful misfeasance, bad faith or gross negligence in the performance of its duties or by reason of its reckless disregard of its obligations and duties under the agreement. The theory supporting recovery against Hoppenfeld and Wiener is that they were "active" wrongdoers who represented to Blair & Co. that the state-

ments contained in the Offering Circular were not false and misleading, while Blair & Co. was merely a "passive" tortfeasor. Upon presenting the cross-claim to the jury, Blair & Co.'s counsel argued that even though it had been found liable by the jury, it was entitled to indemnity from Law Research Service, Inc. for the reason that it, Hoppenfeld and Wiener were the primary wrongdoers and more guilty than Blair itself. Of this there could be no doubt, since Hoppenfeld knew far more of the details involved than Blair and stood to gain more than Blair if the issue was successfully marketed. On the other hand, Blair also was advised by him of certain of the material facts omitted, even though it was not advised of all of them.

▆▆▆▆▆ Apparently the jury concluded that as between the wrongdoers Blair & Co. was less guilty than the others and therefore should be able to collect over from them. After reviewing the matter this Court believes that it would be against the public policy embodied in the federal securities legislation to permit Blair & Co., which has been found guilty of misconduct in violation of the public interest involving actual knowledge of false and misleading statements or omissions and wanton indifference to its obligations and the rights of others, to enforce its indemnification agreement. The purpose of the federal securities acts is to insure that the public investor, including particularly small investors such as the plaintiffs here, will obtain the benefit of a thorough investigation of the facts set forth in a prospectus or offering circular, not only by the issuer but also by the underwriter, so that prospective investors will have access to the truth. If an underwriter were to be permitted to escape liability for its own misconduct by obtaining indemnity from the issuers, it would have less of an incentive to conduct a thorough investigation and to be truthful in the prospectus distributed under its name, than it would be if the indemnity was unenforceable under such circumstances.

It is no answer that the indemnity agreement will not prevent the plaintiff-investor from being made whole, since he may collect against both the issuer and the underwriter. Many defrauded investors fail to sue either because they are unaware of a misrepresentation or lack the funds to finance such expensive litigation. Since §§ 11 and 12(2) of the 1933 Act, 15 U.S.C. §§ 77k, 77l(2), require a diligent investigation by the underwriter, its motivation to conduct such an investigation, and to insure that the circular will be truthful, should not be lessened by permitting enforcement of the indemnity agreement, at least under circumstances where he has been found guilty of misconduct evincing actual knowledge or reckless disregard of the falsity of the offering circular, see III Loss, Securities Regulation 1831; Note, Indemnification of Underwriters and Section 11 of the Securities Act of 1933, 72 Yale L.J. 406, 409–12; compare Chabot v. Empire Trust Co., 301 F.2d 458 (2d Cir. 1962). Substantially similar reasoning supports dismissal of Blair & Co.'s claims based upon the active misconduct of Law Research, Hoppenfeld, and Wiener in contradistinction to its own more passive misconduct.

▆▆▆ Defendant Blair & Co. further contends that since the jury found it to have violated § 17(a) of the Securities Act of 1933, and §§ 10(b) and 15(c) of the Securities Exchange Act of 1934, and assessed punitive damages against it, while finding in its favor on its cross-claim against Law Research, inconsistent verdicts are posed. It seeks to have all verdicts set aside and a new trial ordered.

This is not a case in which written interrogatories were submitted to the jury, so that Rule 49(b), F.R.Civ.P., is inapplicable. In this case the jury appears to have been led by Blair's argument— that the defendants Law Research and Hoppenfeld and third party defendant Wiener bore the primary responsibility— into thinking that their duty was to weigh the respective moral fault of each of the parties. This, however, was not true with respect to the indemnity agree-

ment in favor of Blair as against Law Research. Under these circumstances, the Court is not disposed to grant Blair's motion. Moreover, as was recently said by the learned and able Judge Weinfeld:

> Inconsistent jury verdicts upon different counts or claims are not an anomaly in the law, which at times recognizes a jury's right to an idiosyncratic position, provided the challenged verdict is based upon the evidence and the law. Malm v. United States Lines Co., 269 F.Supp. 731–732 (S.D.N.Y.), affd. per curiam, 378 F.2d 941 (2d Cir. 1967). Accord Sylvestri v. Warner & Swasey Co., 398 F.2d 598, —— (2d Cir. 1968).

Furthermore, dismissal of Blair's cross-claims against Law Research and Hoppenfeld and its impleader action against Wiener removes any inconsistency that even arguably was in existence.

For the foregoing reasons the motion to dismiss Blair & Co.'s cross-claim and third party claim and for judgment notwithstanding the verdict with respect to such claims is granted. All other motions are denied.

So ordered.

## APPENDIX

"Punitive damages are intended to penalize or to punish a defendant for certain kinds of conduct deemed to be against public interest, which involve a high degree of moral culpability.

\*    \*    \*    \*    \*    \*

"In addition to damages compensating a plaintiff for his injuries, you may, but you are not required to, allow a plaintiff punitive damages against any defendants causing the injury complained of if you find that the acts of any such defendants were the result of gross fraud and deceit that was aimed at the public generally and involved a high degree of moral culpability.

"There is no exact rule by which to determine the amount of punitive damages. If you find that the defendants' acts were grossly fraudulent, and aimed at the public generally and involved a high degree of moral culpability, you may fix such amount as in the exercise of your sound discretion and judgment you find will serve to punish the defendant or defendants involved and deter others from commission of like offenses.

"In awarding punitive damages, if you should decide to award them, you are also entitled to fix counsel fees and include such fees in the punitive damages figure that you reach."