**ALEXANDER & BALDWIN, INC.,**
**Plaintiff,**

v.

**PEAT, MARWICK, MITCHELL & CO.,**
**and Hauser, O'Connor & Hylind,**
**Defendants.**

**PEAT, MARWICK, MITCHELL & CO.,**
**et al., Defendants and Third-**
**Party-Plaintiffs,**

v.

**ACME FAST FREIGHT, INC., et al.,**
**Third-Party-Defendants.**

**No. 73 Civ. 2220–CLB.**

United States District Court,
S. D. New York.

Oct. 18, 1974.

See also, D.C., 385 F.Supp. 240.

---

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for third party defendants Thomas A. Bradley, Jr., Estate of Thomas A. Bradley, Rosemary B. Corroon, Kate B. Dishon, Jeanne B. Kelly and Irene B. Parker.

Shearman & Sterling, New York City, for defendant and third party plaintiff Peat, Marwick, Mitchell & Co.

Breed, Abbott & Morgan, New York City, for plaintiff Alexander & Baldwin, Inc.

D'Amato, Costello & Shea, New York City, for defendant and third party plaintiff Hauser, O'Connor & Hylind.

Tibor Sallay, New York City, for third party defendant Acme Fast Freight, Inc.

## MEMORANDUM DECISION ON REARGUMENT

BRIEANT, District Judge.

A motion by defendants and Third-Party Plaintiffs for a reargument of this Court's Memorandum decision of May 9, 1974, or alternatively, for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), compels the conclusion that our recent decision was ill considered. It should be, and is in all respects withdrawn and vacated, and the following is substituted.

We begin *de novo*. On June 30, 1969, the named individual third-party defendants (referred to for convenience as "the Bradley family," or "the Bradleys") owned all of the stock of Acme Fast Freight, Inc., and 21 related corporations (referred to collectively as "Acme"). On that date they agreed to and did sell, on terms, to Alexander & Baldwin, Inc., plaintiff herein ("Alexander").

Acme was then operating what is said to have been the second largest freight forwarding concern in the United States, having a gross consolidated annual revenue in excess of seventy-eight million dollars. Defendant Hauser, O'Connor & Hylind, a firm of certified public accountants ("Hauser") had been acting as auditor for a certain subgroup of the Acme corporations, and Peat, Marwick, Mitchell & Co. ("Peat"), also a firm of certified public accountants, was auditor for others of the Bradley owned corporations. For convenience these defendants are sometimes referred to collectively as the "Auditors".

The sales price of the Acme shares to Alexander was based on a formula which included as an element the "consolidated net worth as of December 31, 1968" to be adjusted downward if, after audit, defendants certified such net worth to be less than $1,300,000.00. Payment was to be made in five equal installments, beginning January 5, 1970.

In January 1972, Alexander refused to pay the installment then due, and on August 14, 1972 sued the Bradleys in this Court (72 Civ. 3442–JMC), pleading nine (9) separate causes of action, demanding various damages ranging from $81,020.00 on account of the "Gaines Motor Lines" transaction to $12,117,-985.00 and a six and one-half million dollar bond, on the Sixth and Seventh Counts, as well as rescission of the stock purchase.

Central to this litigation ("the Bradley case") was a contention by Alexander that certified financials (including those of the Auditors sued here) were not truthful or accurate, or correct as warranted to Alexander by the Bradleys, and relied upon. Specifically, it was alleged that certain liabilities were omitted [Bradley case complaint ¶ 18(a)] and assets overstated [ibid. ¶ 18(b)]. The net diminution in value effected by such inaccuracies was claimed to be "at least $2,265,000.00." Other grievances were asserted against the Bradleys arising out of warranties, representations or alleged omissions to disclose, some of which did not involve activities in which the Auditors participated.

On March 9, 1973, the Bradley case was marked settled and discontinued with prejudice, pursuant to a written agreement dated February 26, 1973, under which Alexander and the Bradleys release all claims against each other with an exception not material here. That agreement provided that the releases

" . . . shall not affect or prejudice the rights, claims and causes of action of every type which the Plaintiff or the Defendants or any of them may now or hereafter have against any third party, including Peat, Marwick, Mitchell & Co. and Hauser, O'Connor & Hylind, in connection with the purchase by the Plaintiff from the defendants of the stock of Acme Fast Freight, Inc. and 21 other corporations under the Agreement dated June 30, 1969, all of which are expressly reserved.

This Agreement shall be governed by and construed under the laws of the State of New York."

At the same time, future and past due installments owed by Alexander to the Bradleys, in the total amount of $2,995,000.00 were discharged by payment of $2,550,000.00 made February 26, 1973.

Alexander could have sued the Auditors in the same action. Instead, it entered into two separate written arrangements, one of which, made with Peat, and dated August 10, 1972, provides in part:

" . . . in the event Alexander & Baldwin, Inc. feels obliged to institute an action against Peat, Marwick, Mitchell & Co. because of alleged claims arising out of the purchase of shares of stock of Acme Fast Freight, Inc. and certain related companies in 1969, for purposes of statute of limitation and laches defenses the parties will treat that action as if it were brought on July 18, 1972."

A substantially similar agreement dated November 20, 1972 with Hauser provides:

" . . . if Alexander & Baldwin, Inc. does not commence suit against Hauser, O'Connor & Hylind before November 21, 1972, in any suit commenced thereafter, the time which elapses between August 5, 1972 and May 21, 1973 shall not be counted in computing the running of time in any applicable statute of limitations or bar of laches and Hauser, O'Connor & Hylind will waive and will not plead any defense of the statute of limitations or bar of laches based on the passage of any period of time between August 5, 1972 and May 21, 1973."

On May 18, 1973 Alexander filed the complaint in this action, seeking damages from the Auditors in substantial amounts. Plaintiffs here plead four counts, arising out of its dealings with the Bradleys. The first count charges Peat with a knowing and willful violation of the securities laws, as a result of having made false or misleading statements, knowingly and wilfully, in its accounting opinion, which "operate[d] as a fraud and deceit upon Alexander & Baldwin" (Complaint, ¶ 15), and upon which Alexander relied in purchasing Acme. Count 2 pleads a common law claim founded on negligence in the expression of the accounting opinion "to such a degree that [Peat's] conduct constituted a reckless disregard for the truth." (Complaint, ¶ 29). The third count pleads against Hauser on the same basis as Count 1 is alleged against Peat. Count 4 asserts against Hauser the same legal theory asserted against Peat in Count 2.

On October 9, 1973 Peat filed a third-party complaint against the Bradleys and others. Hauser's position in the litigation is the same. Peat's pleading may be taken as representative of the claims of both Auditors. It pleads that those Acme financials which Peat audited and certified,

"were prepared by employees and officers of the Acme Companies and were reviewed by them and by some or all of the individual third-party defendants and were presented to Peat, Marwick for examination by or on behalf of the Third-Party Defendants in order to induce Peat, Marwick to report on such financial statements." (Third-Party Complaint, ¶ 18),

that officers and employees of Acme companies made [false and fraudulent] representations to the Auditors to induce their certification, and that this wrongdoing is chargeable to the Bradleys, from whom Peat seeks indemnity or contribution with respect to any damages it may be adjudged to pay Alexander.

The Bradleys seek by motion dated February 14, 1974 to dismiss "the complaint, the third-party complaint . . . insofar as they are grounded on defendants' negligence . . . because the claims are time barred by the applicable statute of limitations, and dismissing the third-party complaints in

their entirety on the ground that they fail to state claims upon which relief may be granted."

## I

## THE STATUTE OF LIMITATIONS FOR NEGLIGENCE

The Bradleys are not parties to the Auditor's letters, previously quoted, which toll "the" statute of limitations. Their rights and liabilities must be considered apart from the letters.

Peat's letter of August 10, 1972 sets forth a date on which any later suit, without express restriction as to the cause or causes of action to be stated, will be treated as having been brought and gives Peat the right to withdraw from this agreement on a month's notice. The words contained in the letter, that *"for purposes of* the . . . defenses" [of statute of limitations and laches] the suit whenever filed, will be considered brought on July 18, 1972, implies that Peat intends to reserve the *right to raise such defenses, but only as* of July 18, 1972.

Hauser's attorney's November 20, 1972 letter states merely that in an effort to avoid litigation, Hauser agrees that a stated period of about 10 months will not be counted in computing the running of time of the statute, or laches, and characterizes this as "an extension of *the* statute of limitations," again without express restriction as to the cause or causes of action pleaded, and adds that:

"The agreement set forth in this letter is without prejudice to the rights and remedies of [Hauser] except as expressly stated above."

Hauser's letter merely carves out a portion of time during which the statute will not run. Otherwise, it reserves Hauser's rights, including the right to plead the statute of limitations as an affirmative defense.

Neither letter waives the statute, nor evinces a clear intention to do so. More important, neither letter refers to the three-year statute applicable to a negligence claim. It is unlikely that the Auditors were unaware of the possibility that Alexander might assert fraud claims which are subject to a six-year statute of limitations.

Peat's letter is dated about four days before Alexander sued the Bradleys. At the time of the Hauser letter, the Bradley action had been commenced. That complaint set forth claims, *inter alia,* based on common law fraud and securities law fraud claims.

Viewed in context, there is no basis for a finding that the letters waived any right or defense, nor that they were written with specific reference to the three-year statute only. *Cf.* Robinson v. City of New York, 24 A.D.2d 260, 265 N.Y.S.2d 566 (1st Dept. 1965). Tested by hindsight, the letters may seem futile, because when issued, more than three years had passed since June 30, 1969, the date of the Acme closing. But it is most likely that when the parties agreed upon the letters, it was uncertain how long the Bradley litigation would continue, and whether the Bradleys would implead the Auditors in that case. The words "action" in the Peat letter and "suit" in the Hauser letter comprise *any* litigation which might arise out of the sale, including an action charging securities fraud or common law fraud.

In sum, we are now of the opinion that the Auditors' letters have no bearing on the motion presently before the Court. If the acts complained of took place on June 30, 1969, the date of closing, then, without regard to the letters, Alexander had until June 30, 1975 to file suit for fraud, under the six-year statute of limitations. To the extent that a three-year statute of limitations applies, and if it began to run on June 30, 1969, then it had expired when the letters were signed.

We now address the question of whether the three-year statute, applicable to negligence claims, began to run on the date of closing, June 30, 1969, at which time all factual elements giving rise to Alexander's negligence claim had

come into existence, or whether the period commenced at some later undetermined date, when Alexander actually knew of the tort, or should have known.

■ Plaintiff's negligence claims are founded on the law of New York, and as such are subject to the three-year statute found in New York CPLR § 214.[1] The period begins when the cause of action arises. In this case, it arose on the day of closing, June 30, 1969, because on that date, Alexander parted with money and was damaged. Damage is an essential element of the cause of action for negligence.

As to the negligence claims, plaintiff had already delayed bringing a lawsuit beyond the three-year period. It now relies on New York medical malpractice theories in an attempt to extend its time. The delay was not caused by any conduct of the accountants on which plaintiff relied. By January 1972 at the latest, when it refused to make the annual payment to the Bradleys, Alexander knew it had a claim. Perhaps it should have known sooner. Under Alexander's agreement with the Bradleys, it had an opportunity to examine the financial books and records of Acme and was permitted to have its own auditors make that examination before the purchase.

The equities are decidedly against plaintiff here. It slept on its rights from January 1972 until August of that year before pressing its claims against the Bradleys or the Auditors, and as noted, more than three years had expired when the Auditors' letters were signed.

We turn now to the "foreign object", and "continuing treatment" extensions of the negligence statute of limitations. Here we must rely on New York case law.

■ There is no validity to plaintiff's "continuing treatment" theory, recognized in medical malpractice actions. The Auditors completed their services before the closing on June 30, 1969, and their "treatment" ended on that date.[2]

■ Plaintiff also claims an accountant's malpractice is akin to the "foreign object" exception adopted in Flanagan v. Mount Eden General Hospital, 24 N.Y.2d 427, 301 N.Y.S.2d 23, 248 N.E.2d 871 (1969), in which the New York Court of Appeals held that

> where a patient cannot discover that an act of medical malpractice has taken place in which a foreign object has negligently been left in the patient's body, the Statute of Limitations will not begin to run until the plaintiff could have reasonably discovered the malpractice.

Plaintiff argues that an accountant's malpractice is also deeply embedded in the body of his client's books and records, and may need considerable time to discover. However, the New York Court of Appeals carefully restricted its ruling in *Flanagan*. The issue which that court addressed was "when should the Statute of Limitations begin to run in a foreign object medical malpractice case?" *Flanagan, supra,* 24 N.Y.2d p. 429, 301 N.Y.S.2d p. 25, 248 N.E.2d p.

---

1. The statute reads in relevant part as follows:
 "§ 214. Actions to be commenced within three years: for non-payment of money collected on execution; for penalty created by statute; to recover chattel; for injury to property; for personal injury; for malpractice; to annul a marriage on the ground of fraud
 The following actions must be commenced within three years:
 \*　　\*　　\*　　\*　　\*
 4. an action to recover damages for an injury to property;

5. an action to recover damages for a personal injury except as provided in section 215;
 6. an action to recover damages for malpractice; . . . ."

2. Peat submitted the report said to be fraudulent to the third-party defendants on May 13, 1969, and Hauser's report arrived on June 13, 1969. The final purchase agreement, quoted in ¶ 11 of the Complaint in this action, shows that the reports of both Auditors were delivered to plaintiff no later than June 30, 1969. Plaintiff retained its own auditors (Haskins & Sells) and never employed Peat or Hauser.

872. It was held that the policy reasons supporting the statute of limitations lacked force where the surgical clamps constituted real evidence that would not become unrecognizable with the passage of time, and the claim could not become stale because " 'evidence has been lost, memories have faded, and witnesses have disappeared' ", nor is there any danger of "belated, false or frivolous claims," nor is the action based on "professional diagnostic judgment or discretion." *Flanagan, supra*, 24 N.Y.2d p. 429, 301 N.Y.S.2d p. 25, 248 N.E.2d p. 872. The glaring presence of the foreign object, in *Flanagan*, is itself enough to overcome the policies underlying the statute of limitations.

If the malpractice consists of negligent treatment or medication rather than leaving a foreign object in the body, the judicially engrossed exception to the statute does not apply. *Flanagan, supra*, 24 N.Y.2d p. 430, 301 N.Y.S.2d p. 26, 248 N.E.2d p. 872. There is no guaranty of truthfulness of the sort furnished by the physical presence of the foreign object to outweigh the policy against stale, and therefore presumably untruthful, claims which underlies the statute of limitations. New York cases since *Flanagan* have carefully stayed within its factual boundaries.

The rule has not been applied to cases of incorrect diagnosis [Schiffman v. Hospital For Joint Diseases, 36 A.D.2d 31, 319 N.Y.S.2d 674 (2d Dept. 1971)], although lower appellate courts have extended it to a case in which a defective pin inserted in the plaintiff's hip broke four years later [Murphy v. St. Charles Hospital, 35 A.D.2d 64, 312 N.Y.S.2d 978 (2d Dept. 1970)], and to a case in which plaintiff discovered four years later that his pancreas had been physically cut or damaged during an operation on his 330 N.Y.S.2d 743 (4th Dept. 1972)]. 330 N.Y.S.2d 743 (4th Dept. 1972) ].

In *Schiffman,* the same court which decided *Murphy,* declined to apply the *Flanagan* rule where biopsy slides had been interpreted incorrectly as non-malignant. *Flanagan* and *Murphy* were distinguished primarily on the ground that in those cases, professional interpretation or medical judgment was not required, and here the biopsy slides were known to exist and could have been reexamined. Both of these factual distinctions apply with equal force to Alexander's case: the Auditors' reports were available to the plaintiff before the closing, and professional interpretation and judgment is as much a part of a financial audit as of a biopsy report.

New York courts have declined to extend the "foreign object" rule absent the inherent reliability previously mentioned of the presence of a foreign object or physical trauma to an internal organ.

In Sosnow v. Paul, 43 A.D.2d 978, 352 N.Y.S.2d 502 (2d Dept. 1974), an action for malpractice against architects, reliance on the *Flanagan* rule was rejected, although the claimed defects in the building were not, and probably could not have been, discovered until long after completion of construction. The Court held [pp. 503–504 of 352 N.Y.S.2d]:

"The rule in cases where the gravamen of the suit is professional malpractice is now and has always been that the cause of action accrues upon the performance of the work by the professional [citations omitted] * * * The *Flanagan* case permits an exception to the cited rule *only* in medical malpractice cases where the malfeasance charged is leaving a foreign object in the patient's body. * * * In Siegel [v. Kranis, 29 A. D.2d 477, 288 N.Y.S.2d 831 (2d Dept. 1968)] we applied to a lawyer-client relationship the continued treatment doctrine * * * and held that a cause of action for malpractice against an attorney commences upon the termination of the lawyer-client relationship. Assuming that the malpractice complained of at bar was perpetrated prior to the completion of plaintiffs' buildings, the rule enunciated in *Siegel* would at best cause the Statute of Limitations to have been tolled until the date of completion of construction and the termination of

the parties' professional relationship." (Emphasis in original)

Following *Siegel,* the First Department applied the continuing treatment rule to lawyer's malpractice, but declined to extend the *Flanagan* rule in such a case. Gilbert Properties, Inc. v. Millstein, 40 A.D.2d 100, 338 N.Y.S.2d 370 (1st Dept. 1972).

The statute of limitations for an accountant's negligent preparation of financial statements was held to be three years from the date of injury in Wasserman v. Herwood, 36 Misc.2d 522, 232 N.Y.S.2d 730 (Sup.Ct.N.Y.Cty.1962).

A fair reading of the New York cases compels the conclusion that the highest Court has not extended the "foreign object" exception of *Flanagan* beyond its particular facts, and is most unlikely to do so. The "continuous treatment" rule is applicable in New York to the negligence or malpractice of lawyers, architects and accountants, but not available to plaintiff under the facts of the instant case.

 Finally, it should be noted that plaintiff's lack of awareness that a cause of action exists does not toll the statute of limitations when the facts are available. 509 Sixth Ave. Corp. v. New York City Tr. Auth., 15 N.Y.2d 48, 51, 255 N.Y.S.2d 89, 91, 203 N.E.2d 486, 487, (1964); Schmidt v. Merchants Desp. Transp. Co., 270 N.Y. 287, 300, 200 N.E. 824, 827 (1936); Varga v. Credit Suisse, 5 A.D.2d 289, 171 N.Y.S.2d 674 (1st Dept. 1958), aff'd 5 N.Y.2d 865, 182 N.Y.S.2d 17, 155 N.E.2d 865. As held in *Schiffman, supra,* 36 A.D.2d p. 35, 319 N.Y.S.2d p. 678:

"The Statute, rather, presumes that the lapse of time indicates the party's disinclination to enforce the cause."

Hochfelder v. Ernst & Ernst, 503 F.2d 1100 (7th Cir. 1974), upon which plaintiff would have us rely, is clearly inapplicable to the New York statute of limitations provisions here considered. The statute of limitations issue considered in *Hochfelder* referred to the plaintiff's Rule 10b–5 federal claims. There is no mention in that case of any state claim based on negligence or professional malpractice. Assuming the Seventh Circuit would apply an equitable tolling doctrine to such a state negligence claim, it could only be in reliance on Illinois state law, rather than New York law, upon which this Court must rely.

We conclude that the original claims, and the third-party claims, to the extent that they are based on negligence, are barred by the three year statute of limitations.

## II

## CONTRIBUTION AND INDEMNIFICATION

The third-party defendants urge that federal public policy expressed in the securities laws requires that an intentional, or fraudulent wrongdoer be denied indemnity or contribution from those who procured or assisted in the fraud or deceit. They cite State Mutual Life Assurance Co. v. Peat, Marwick, Mitchell & Co., 49 F.R.D. 202 (S.D.N.Y.1969) and Globus v. Law Research Service, Inc., 287 F.Supp. 188 (S.D.N.Y. [Globus I] mod. 418 F.2d 1276 (1969). The holding in *State Mutual* is based on several grounds, including a view that:

"To permit public accounting firms to escape liability for misconduct in the performance of their duties by obtaining indemnity from the alleged participants in the misconduct would be violative of both the public policy embodied in the federal securities legislation and the public faith reposed in these firms. If accountants could escape liability for their own misfeasance by obtaining indemnity from the officers of the corporation whose financial statements they have fraudulently prepared, there would be much less incentive to be thorough in examination and truthful in reporting."

Certain provisions of the federal securities acts recognize a right to contribution. See 11(f) of the 1933 Act, 15 U.S.C. § 77k(f), and 9(e) and 18(b) of the 1934 Act, 15 U.S.C. §§ 78i(e), 78r(b).

The sections vary somewhat, but are to the same effect. Section 18(b) of the 1934 Act reads:

"Every person who becomes liable to make payment under this section may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment."

Clearly these sections permit contribution between persons engaged in fraud.

There is no express statutory provision for contribution with respect to Sections 10(b) of the 1934 Act, or 17(a) of the 1933 Act, undoubtedly because there is no express private right of action under these sections. Reasoning that the policy considerations which persuaded Congress to allow contribution where it granted a private right of action should persuade courts to allow contribution where the courts implied such a right, contribution was permitted under § 10(b) in deHaas v. Empire Petroleum Co., 286 F.Supp. 809 (D.Colo. 1968), aff'd in part and vacated in part, 435 F.2d 1223 (10th Cir. 1970). In general,

"[t]o avoid . . . inconsistencies, courts have endeavored to treat the '33 and '34 Acts *in pari materia* and to construe them as a single comprehensive scheme of regulation." Globus v. Law Research Service, Inc., 418 F.2d 1276, 1286 (2d Cir. 1969 [Globus I]).

As Judge Frankel thereafter observed, the result reached in *deHaas* was simply "a pertinent application" of the *in pari materia* effort (Globus, Inc. v. Law Research Service, Inc., 318 F.Supp. 955, 958 (S.D.N.Y.1970), aff'd on opinion below, 442 F.2d 1346 (1971) [Globus II]).

■ The degree of culpability is not material to the question of whether defendants in a securities fraud case may seek contribution from each other. In *Globus I*, "there was evidence from which an inference of fraudulent, wan-ton and willful misconduct involving high moral culpability and disregard for the public could be drawn" (287 F.Supp. at 192), yet contribution between the defendants was allowed, on the theory that [318 F.Supp. at 958]

"The prior decisions of Judge Mansfield and the Court of Appeals denying Blair's claim to indemnity support Blair's position now. A central ground for the ruling on indemnity was the judgment that allowing such means of absolution would dilute the deterrent impact of the securities laws, which seek 'to encourage diligence, investigation and compliance with the requirements of the statute by exposing issuers and underwriters to the substantial hazard of liability for compensatory damages.' *Id.* [418 F.2d] at 1289. The shoe is now on the other foot. If not identical, the mode of escape sought by LRS and Hoppenfeld is objectionable on substantially similar grounds. They may not effectively nullify their 'liability for compensatory damages' by leaving the whole of the burden to the more prompt and diligent party with which they have been cast in joint and several liability."

■ Because of the deterrent policy of the securities laws, even intentional tortfeasors may obtain contribution so that other tortfeasors will not escape liability. This purpose will be served if defendant tortfeasors are allowed to implead any other tortfeasors involved in the fraud.

Relying on *Globus II* and *deHaas, supra*, two subsequent decisions in this District permitted an accounting firm to implead third-party defendants it claimed gave false information on which the accountants relied in certifying financials. See State Mutual Life Assurance Co. of America v. Arthur Andersen & Co., CCH Fed.Sec.L.Rep. (1973–74 Transfer Binder) ¶94,543 (S.D.N.Y. 1972); Tucker v. Arthur Andersen & Co., CCH Fed.Sec.L.Rep. (1973–74 Transfer Binder) ¶94,544 (S.D.N.Y.

1974). *Tucker* is a companion case to *State Mutual,* arising out of the same transaction. Both allege violations of federal securities laws and New York common law and charge Andersen with intentional fraud in certifying false financial statements. Andersen's third-party complaint charges that the third-party defendants are responsible because they gave the accountants false information. *State Mutual* held that [CCH Fed.Sec.L.Rep. at ¶95,867]:

> "As a matter of federal law, the right to contribution has been recognized, even among intentional wrongdoers, in the second *Globus* decision. . . . Impleader has been permitted in such a situation, even though plaintiff has sued only one and not all of the alleged wrongdoers. deHaas v. Empire Petroleum Company, 286 F.Supp. 809 (D.Colo.1968)."

In view of the claim that the accountants had actual knowledge of the falsity of the financial statements, however, the court held:

> "The federal law in this circuit, which applies to the federal claims, is that in such circumstances Andersen may not obtain *full indemnity* from the third parties." CCH Fed.Sec.L.Rep. ¶95,867 (Emphasis supplied.) (citing Globus II)

There is a clear distinction, therefore, in the cases decided after *Globus II,* between contribution granted to intentional tortfeasors, and indemnity, which is withheld.

Both *Tucker* and *State Mutual, supra,* denied motions to dismiss the third-party complaints for failure to state a claim, and squarely held the right to contribution exists under federal law for intentional tortfeasors in exactly the same factual situation as is presented by the third-party action in this case. See also, Altman v. Liberty Equities Corp., 54 F.R.D. 620 (S.D.N.Y.1972) (right to contribution exists and is governed by federal law); Land v. Commonwealth United Corp., 17 F.R.Serv.2d 43 (S.D.N.Y.1973); Getter v. Dickinson, 366 F.Supp. 559, 569 (S.D.Iowa 1973).

■■ Settlement of the prior lawsuit by the Bradleys does not bar assertion of the claim for contribution against them here. The settlement agreement and release between the Bradleys and Alexander provides that the agreement is to be governed by New York law, and specifically preserves all parties' rights against the accountants. Had the agreement been silent with regard to the accountants, the result would have been the same. Alexander's cause of action against the Auditors is reserved by law in the absence of an express waiver. New York General Obligations Law § 15–108, McKinney's Consol.Laws, c. 24–A, provides that a general release given to one tortfeasor does not discharge any other tortfeasor unless the release so provides.[3] Not only does this preserve the rights of the injured party, but it preserves any right to contribution there may be against the released tortfeasor.

> "[T]he usual form of general release . . . will not prevent a plaintiff from suing a joint tortfeasor. If such a subsequent action were brought against the joint tortfeasor, then it is predictable that the party who thought he purchased his peace . . . will now find himself right back in the litigation as a third-party defendant. The consideration paid is non-refundable and may only be used as a partial affirmative defense in mitigation of plaintiff's damages." [Ausubel,] "The Impact of New York's Judicially Created Loss Apportionment Amongst Tortfeasors—Dole v. Dow Chemical Co.," 38 Albany L.Rev. No. 2, 155, 169–70 (1974).

■ "Fairness between the parties," the criterion now in effect in New York for resolving a demand for contri-

---

3. New York law prior to enactment of General Obligations Law § 15–108 was precisely to the contrary. The action against the Bradleys was filed prior to the effective date of the statute but the release was not executed until February 1973.

bution, requires that when one tortfeasor settles with an injured party, he should get no more than he bargained for. The Bradleys settled, electing not to implead the Auditors and thereby resolving the entire matter in one lawsuit as could have been done. Should Alexander prevail here, and the Auditors be awarded contribution from the Bradleys, the latter would be entitled to deduct from their apportioned share of the damages the sum already paid to Alexander in settlement of the prior action. As noted *supra,* p. 232, some undetermined part of the prior settlement includes claims in which the Auditors were not involved, as well as the effect of prepayment of future installments. Separation of these matters may well be difficult of resolution, as the parties to the prior lawsuit should have foreseen.

## CONCLUSION

The original motion to dismiss the negligence counts of the complaint was made solely by the Bradleys. However, the answers of both defendants plead affirmative defenses applicable to plaintiff's negligence claims based on the New York State three year statute of limitations.

Defendants Peat and Hauser separately moved for reargument with respect to those portions of this Court's order dated June 4, 1974 denying the Bradleys' motion to dismiss the second and fourth counts *of the complaint* alleging negligence, in addition to seeking reargument of that portion of the order dismissing the third-party complaints with leave to serve amended third-party complaints demanding contribution only, and limited to causes of action other than those based on negligence.

Upon such reconsideration and reargument of the motion made by the Bradleys, and now joined in by the defendants, both causes of action of the complaint based on negligence are dismissed.

All determinations made by our prior order with respect to the third-party complaints remain in effect, although based on different reasoning. Third-party plaintiffs may continue to press their claims to contribution only, and only with respect to the claims in the complaint now remaining.

Settle order on notice.