418 F.2d 1276
 Fed. Sec. L. Rep. P 92,474
Morton GLOBUS et al., Plaintiffs-Appellees,
v.
LAW RESEARCH SERVICE, INC. and Ellias C. Hoppenfeld,
Defendants-Appellants.
BLAIR & CO., GRANBERY MARACHE Incorporated,
Defendant-Appellant and Third-Party Plaintiff-Appellant,
v.
Paul WIENER, Third-Party Defendant-Appellee.
 Nos. 583-85, Docket 32766-32768.
 United States Court of Appeals Second Circuit.
 Argued May 15, 1969.
Decided Sept. 8, 1969, Certiorari Denied Feb. 24, 1970, See
90 S.Ct. 913.
 
 Harold L. Young, New York City (Cooper, Ostrin, DeVarco & Ackerman, Herman E. Cooper, Philip D. Tobin, New York City, on the brief), for plaintiffs-appellees.
 Alfred S. Julien, New York City (Julien, Glaser & Blitz, Helen B. Stoller, New York City, on the brief), for defendants-appellants and LRS and Hoppenfeld and third-party defendant-appellee, Wiener.
 Douglas M. Parker, New York City (Mudge, Rose, guthrie & Alexander, Goldthwaite H. Dorr, Robert P. Visser, New York City, on the brief), for defendant-appellant and third-party plaintiff-appellant Blair & Co., Granbery Marache Inc.
 Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 This tortuous litigation raises at least two issues of great importance: are punitive damages available in private actions based on 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a); and, may an underwriter be indemnified by an issuer for liabilities arising out of misstatements in an offering circular of which the underwriter had actual knowledge? We hold that punitive damages may not be recovered under 17(a) and that an underwriter may not be indemnified in a case such as this.
 
 
 2
 The plaintiffs-appellees, purchasers of the stock of Law Research Services, Inc. (LRS), initiated this action against LRS, its president Ellias C. Hoppenfeld, and the underwriter of LRS's public stock offer, Blair & Co., Granbery Marache, Inc. (Blair). They contended that the appellants violated 17(a) of the Securities Act of 1933, 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b),[1] and also committed common law fraud. The essence of their charge is that the offering circular prepared in connection with LRS's offer to sell 100,000 shares of its stock to the public under Regulation A of the Securities and Exchange Commission[2] was misleading since it prominently featured an attractive contract between LRS and the Sperry Rand Corp. (Sperry Rand) while failing to refer to a dispute between the two companies which had led Sperry Rand to terminate some of its services to LRS and in turn caused LRS to file suit against Sperry Rand. Moreover, the plaintiffs contended that Blair's actions violated 12(2) of the 1933 Act, 15 U.S.C. 77l(2), and 15(c) of the 1934 Act, 15 U.S.C. 78o-c.[3]
 
 
 3
 Judge Mansfield presided over a ten-day trial of these claims, to a jury in the Southern District of New York. The jury returned a verdict in favor of Blair, LRS and Hoppenfeld on the common law fraud claim but also decided that all three had violated both the Securities Act of 1933 and the Securities Exchange Act of 1934. Accordingly, the jury awarded compensatory damages to all plaintiffs totaling $32,591.14 and punitive damages against Hoppenfeld in the amount of $26,812.06 and Blair in the amount of $13,000, based on the violation of 17(a) of the 1933 Act.
 
 
 4
 The jury was also called upon to deal with a cross-claim asserted by Blair against LRS, which rested on an indemnity clause included in the underwriting agreement, and against Hoppenfeld and a third-party defendant, Paul Wiener, Secretary-Treasurer of LRS, sounding in tort. At the same time, LRS and Hoppenfeld asserted a cross-claim against Blair, grounded on the same indemnity agreement. On all these cross-claims, the jury found for Blair.
 
 
 5
 Blair and Hoppenfeld then moved unsuccessfully to have Judge Mansfield set aside the award of punitive damages. LRS, Hoppenfeld and Wiener, however, moved successfully to set aside the verdict on the cross-claims for indemnity and the entry of judgment, pursuant to Fed.R.Civ.P. 50(b). Judge Mansfield's careful and thorough opinion of July 19, 1968 is reported at 287 F.Supp. 188. In sum therefore, LRS, Hoppenfeld and Blair appeal from the award of damages to appellees and Blair appeals from the Judgment on the cross-claims and third-party action.
 
 I-- FACTS
 
 6
 Law Research Service is a child of the computer age. In 1960, Hoppenfeld, a lawyer with some background in computer technology, perceived that computers could greatly facilitate legal research. He concluded that a practical system could be developed in which thousands upon thousands of court opinions would be fed into a computer, so that when a legal problem was submitted to the machine it would then select and retrieve all the relevant precedents. For this service, lawyers would be required to pay an annual subscription and a small fee per inquiry. After mulling over the practicability of his conception for some time, Hoppenfeld organized LRS in 1963. He became its founder, president, legal advisor, director and sole stockholder. Wiener, Hoppenfeld's friend of many years, agreed to serve as Secretary-Treasurer of the corporation. Similar ideas for marrying computers to the law have been put forth but it seems that LRS was the first such legal information retrieval system to be tried commercially.
 
 
 7
 Though Hoppenfeld was familiar with data systems, he recognized that greater expertise was called for if the new company was to become commercially successful. Moreover, he could not afford to purchase the expensive and sophisticated hardware necessary to bring his concept to fruition. Accordingly, on June 5, 1963, he entered into a five-year contract with the Univac (computer) division of the Sperry Rand Corporation. This agreement provided among other things that LRS was to furnish the legal data while Sperry Rand would supply such vital services as computer trial, programming, keypunching and printing. LRS also moved into the Sperry Rand building in New York City.
 
 
 8
 LRS's information retrieval system became operational in February 1964. By August of that year, the company managed to accumulate some $82,000 in debts to Sperry Rand. During that summer month, Hoppenfeld first met with Malcolm Sanders, a vice president of Blair, to explore ways of getting the $82,000, and other needed funds for the company. Sanders suggested a public offering which would raise not only enough money to cover the debt to Sperry Rand but would permit LRS to expand its computer library to cover decisions of the federal courts as well as those of the New York courts then already on tape.
 
 
 9
 On September 9, 1964, Sanders wrote Hoppenfeld that Blair was interested in raising $500,000 in new capital for LRS. He indicated that although bank financing or other loans might be arranged for part of the total, 'we would raise the bulk of the money through the sale of equity.' Accordingly, Sanders proposed that LRS retain a 'nationally recognized firm of auditors who will set up principles of accounting which will be used by you in your presentation to investors.' Hoppenfeld testified that Sanders introduced him to a partner in the accounting firm of Arthur Young & Co. (Young) and at Sanders' suggestion, LRS retained the firm to conduct the necessary audit. Arthur Young & Co. served as accountants for both Blair and Blair's counsel, then Nixon, Mudge, Rose, Guthrie, Alexander, & Mitchell (now Mudge, Rose, Guthrie & Alexander and hereinafter Nixon Mudge), which firm subsequently played a role in the preparation of the offering circular. Thereafter, Frederick B. Johnston, an associate of Arthur Young & Co., spent two or three days a week and occasional weekends between November 1964 and March 1965 at the LRS office, examining all of its books, records and legal files.
 
 
 10
 During this time, however, dissension had arisen between Sperry Rand and LRS and in October 1964, Hoppenfeld informed both Johnston of Young and Co., and Sanders of Blair, that LRS had served a summons on Sperry Rand in an action based on the debt LRS allegedly owed the computer corporation and the adequacy of the office space alloted to LRS. LRS opted to let this action lapse in December 1964 by not filing a complaint. Hoppenfeld testified he permitted this so that he could continue negotiations with Sperry Rand, whose vice president for legal services, Robert C. Sullivan, refused even to discuss the dispute or anything else with Hoppenfeld while the summons was outstanding.
 
 
 11
 On January 25, 1965, the crisis began. J. E. Murdock, New York regional manager of Sperry Rand's Univac division, informed LRS by letter that unless it paid $82,897 by Friday, January 29, 1965, Sperry Rand would consider the contract 'terminated.' Hoppenfeld immediately proceeded to the Sperry Rand office in the same building to discuss the matter with Sullivan. whom the LRS president considered to be Murdock's superior.[4] After Hoppenfeld informed Sullivan that the financing was taking longer than expected and that Sperry Rand would be paid out of the proceeds of the public offering, Hoppenfeld testified, Sullivan replied that Sperry Rand's sole interest was getting paid and that if this was achieved all would be well.
 
 
 12
 Nevertheless, on January 29, Sperry Rand refused to permit LRS to use its computers for processing inquiries for LRS subscribers. It did, however, continue to provide keypunching and other services.[5] On the same day, LRS initiated a suit against Sperry Rand. This new litigation was, like its predecessor, instituted by the service of a summons without a complaint. An affidavit by Wiener submitted with the summons indicated that the cause of action was based on breach of contract and fraud.
 
 
 13
 These two events of January 29, Sperry Rand's termination of computer services and LRS's lawsuit, are the material facts which the appellees claim were omitted from the offering circular.
 
 
 14
 Blair and LRS are in complete disagreement as to whether Hoppenfeld informed its underwriter of these events. Hoppenfeld explicitly testified that he told Sanders during February 1965 that Sperry Rand had refused LRS the use of its computers. Moreover, Hoppenfeld and Johnston held a 'bare diligence' meeting on February 23 to review any new developments which might affect the issue of the stock. At that time, Hoppenfeld insists he divulged to Johnston the recent legal activity. Hoppenfeld also claimed that Johnston appeared on February 23 as the representative of both Arthur Young & Co. and Blair.
 
 
 15
 Despite all this, the plans for the public offering proceeded and ultimately became effective on March 15, 1965. It authorized the issuance of 500,000 shares of which 100,000 would be offered to the public, at $3 per share. All the stock was sold in a few days, resulting in net proceeds to LRS of $260,000.[6] Hoppenfeld retained 200,000 shares for himself. The offering circular, which accompanied every sale of the stock, referred in bold face type to the Sperry Rand contract and described the agreement in detail. It went on to note:
 
 
 16
 'The Company at December 31, 1964 was indebted to the Sperry Rand Corporation in the amount of $82,285 for key punching and other services. * * * The Company hopes, but has no commitment, that payment of part of this indebtedness can be deferred. The Company intends to repay this amount * * * from the proceeds of the sale of the Common Stock offered hereby. * * *'
 
 
 17
 The offering circular failed to mention or even suggest the events of January 29 or the dispute between LRS and its 'supplier' had occurred.
 
 
 18
 Hoppenfeld sought to explain this startling omission by urging that, although he was a lawyer of long experience and was listed in the offering circular as the person who passed on legal matters in connection with the offering for LRS, he relied on the advice of Blair, Young and Nixon Mudge. He recalled they told him that only lawsuits pending against LRS would have to be reported and hence he did not mention the suit brought by LRS. Blair on the other hand contended that it first became aware of the LRS suit on April 7 when a representative of the SEC telephoned William Bailey, the attorney at Nixon Mudge who had supervised the preparation of the LRS offering circular. The SEC wanted to know if Bailey was aware of LRS's legal actions against Sperry Rand.
 
 
 19
 In either event, a series of hastily called meetings were held after April 7 and, on April 21, Sperry Rand was paid in full and the LRS suit was dismissed with prejudice. The next day a 'report from the President' was mailed to all LRS shareholders describing, in rather vague terms, the entire affair.[7]
 
 
 20
 Morton Globus, apparently the prime mover in initiating the action before us, is a broker-dealer in securities. He became aware of the proposed LRS offering shortly before March 15 by reading a small item in the Commercial and Financial Chronicle. Globus found the concept of utilizing computers in legal matters exciting and on March 12, 1965, he wrote Blair for copies of the offering circular. These he then sent to some of his customers. But, before mailing, Globus personally underlined significant sections of the offering circular including the paragraphs dealing with the Sperry Rand contract. The other plaintiffs are small investors and customers of Globus who purchased LRS between March 16 and April 20, 1965. The thirteen appellees purchased 23% Of all the LRS stock offered to the public.
 
 
 21
 Mr. Globus bought 4,400 shares for himself at prices ranging between 4 and 4 5/8. He sold them on September 13, 1965 at 2 3/4 for a loss of $7,561. He admitted that he sold the stock with the intention of taking a loss for tax purposes and hoped to repurchase LRS later. On October 27, 1965 he bought back 4,000 shares which he later resold at a considerable profit. The other appellees, however, asserted that they did not intend to repurchase LRS when they sold their shares. They stated that they relied on the offering circular in deciding to buy LRS and were specifically impressed by the mention of the Sperry Rand contract. It appears to us therefore, that there was adequate evidence from which the jury might conclude that the dispute and lawsuit between LRS and Sperry Rand was a material fact the omission of which from the offering circular caused the circular to be misleading. Also there was ample evidence, albeit based largely on Hoppenfeld's testimony, to support the conclusion that Blair had knowledge of that important dispute.
 
 II-- PUNITIVE DAMAGES
 
 22
 Judge Mansfield charged the jury that punitive damages could be awarded against the appellants if it found their conduct involved 'a high degree of moral culpability of a type that would in effect constitute moral turpitude or dishonesty and a wanton indifference to one's obligations.' 287 F.Supp. at 193. This standard of 'high moral culpability' was drawn from a New York case permitting punitive damages in fraud actions. Walker v. Sheldon, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961).
 
 
 23
 Punitive, or exemplary damages, as they are sometimes called, are not available for violations of 10(b) of the 1934 Act. Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766; Meisel v. North Jersey Trust Co. of Ridgewood, N.J., 216 F.Supp. 469 (S.D.N.Y.1963). But the district court instructed the jury that this did not inhibit it from making an award of such damages under 17(a) of the 1933 Act. Accordingly, the jury awarded punitive damages against Hoppenfeld and Blair, although no such damages were assessed against LRS itself. This appears to be the first occasion on which punitive damages have actually been awarded for a violation of the securities acts. But cf. Nagel v. Prescott & Co., 36 F.R.D. 445 (N.D.Ohio 1964) (denying motion to strike interrogatories on ground that punitive damages are available under the 1933 Act).
 
 
 24
 Section 17(a) on its face simply makes it unlawful for sellers of securities to engage in fraudulent transactions or to omit to state material facts. As with other provisions of the securities acts, several courts have indicated that a private right of action will lie for the violation of the provisions of this section. See Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y.1964); Thiele v. Shields, 131 F.Supp. 416 (S.D.N.Y.1955); Note, Implying Causes of Actions from Federal Statutes, 77 Harv.L.Rev. 285 (1963). See also Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 n. 2 (2 Cir., 1951); Katz v. Amos Treat & Co., 411 F.2d 1046 (2d Cir. May 16, 1969). But even today there lingers some unhappiness with this principle. See 6 Loss, Securities Regulation 3912 (1969). Since we affirm only the award of compensatory damages, which could stand either on the basis of 10(b) of the 1934 Act or 17(a), we need not tarry over whether 17(a) standing alone would support an action for compensatory damages. My brother Friendly pointed out in his concurring opinion in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 867 (1968), cert. denied sub nom., Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), that there seems little practical point in denying the existence of an action under 17 once it is established that an aggrieved buyer has a private action under 10(b) of the 1934 Act. But we still must determine whether 17(a) will suffice as a basis for punitive damages.
 
 
 25
 The issue is complicated by the presence of a conflicting gaggle of 'general rules.' Although some courts have not hesitated to include recovery of exemplary damages when upholding the right to bring an action implied by the provisions of a specific statute, e.g., Basista v. Weir, 340 F.2d 74, 84-88 (3d Cir. 1965); Wills v. Trans World Airlines, 200 F.Supp. 360 (S.D.Cal.1961), other courts have stated that 'absent express Congressional intention punitive damages (are) not recoverable when invoking the jurisdiction of the court on a federally created cause of action.' Burris v. International Brotherhood of Teamsters etc. Union, 224 F.Supp. 277, 280 (W.D.N.C.1963); United Mine Workers v. Patton, 211 F.2d 742, 749 (4th Cir.), cert. denied, 348 U.S. 824, circumstantial evidence may Congress has intended that damages in excess of the actual damage sustained by the plaintiff may be recovered in an action created by statute, it has found no difficulty in using language appropriate to that end'); Green v. Wolf Corp., supra, 406 F.2d at 303 ('we have gone far beyond the limits of the common law in imposing liability under 10b-5 (of the 1934 Act) and thus may not import all the other aspects of common law fraud without scrutiny.')
 
 
 26
 We need not opt for either of these conflicting generalities; rather, we rely on an analysis of the role punitive damages would play in the statutory scheme established for the enforcement of the Securities Act. In 1933, when this scheme was formulated, the prevailing opinion among knowledgeable commentators and members of the Securities and Exchange Commission was that civil liability would be limited to the express liability provisions of 11 and 12 of the Act; 17(a) would serve as a basis only for criminal or injunctive action. See Landis, The Liability Sections of the Securities Act, 18 Am. Accountant 330, 331 (1931), quoted in 3 Loss, supra, 1784-1785 (1961); Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 181-82 (1933); Note, Federal Regulation of Securities: Some Problems of Civil Liability, 48 Harv.L.Rev. 107 (1934). See also 54 Va.L.Rev. 1560, 1566 (1968). Those sections of the Act which provide expressly for civil liability restrict themselves to compensatory damages. 15 U.S.C. 77k(e), 77l(2). See Shonts v. Hirliman, 28 F.Supp. 478, 482 (S.D.Cal.1939). Since even in this day of easily implied liability under the securities acts, it is not settled to everyone's satisfaction that compensatory damages are authorized by 17(a), it would no doubt jolt and startle the draftsmen of the 1933 Act to be told that they also authorized the recovery of punitive damages when that section was formulated.
 
 
 27
 But neither Congressional mindreading nor stenciling the bounds of the express liability sections onto 17(a) provide a firm basis for decision. Since it is more difficult to prove a violation of 17(a) than the express liability provisions of the 1933 Act, see Thiele v. Shields, supra, a court implying a remedy under 17 is not necessarily bound by the restraints of the express liability sections. For example, civil actions under 17(a) are not subject to the same time limitations as are suits under the latter provisions. Katz v. Amos Treat & Co., supra, 411 F.2d at 1056 n. 10; Turner v. Lundquist, 377 F.2d 44 (9th Cir. 1967); Charney v. Thomas, 372 F.2d 97 (6th Cir. 1967).
 
 
 28
 The seminal question is whether punitive damage recovery is necessary for the effective enforcement of the Act. Undeniably, punitive damages would deter violations of the Act and punish those who did commit violations. Cf. Green v. Wolf Corp., supra; Restatement, Torts 908, Comment a. See generally Note, Exemplary Damages in the Law of Torts, 70 Harv.L.Rev. 517 (1957); Note, The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages, 41 N.Y.U.L.Rev. 1159 (1966). But, as the trial court conceded, see 287 F.Supp. at 194, plaintiffs under the securities acts already possess an extensive 'arsenal of weapons' which serve to perform the functions of retribution and deterrence.
 
 
 29
 The 1933 Act provides not only for a fine but five years imprisonment for those who violate 17(a). 15 U.S.C. 77x. Moreover, the SEC may suspend or expel those who violate the securities acts or suspend trading in a particular stock. Furthermore, private actions often lead to sizable recoveries and to considerable deterrent clout. In Green v. Wolf Corp., supra, we recognized that a class action under Fed.R.Civ.P. 23 could be particularly effective and appropriate in remedying violations of the securities acts when the injury to any individual was not large enough to provoke him to legal action. Thus a recurring rationale for punitive damages-- that the lure of a windfall is required to encourage suits to enforce the Act-- has lesser impact where the class action for the small litigant would be appropriate.[8] Compensatory damages, especially when multiplied in a class action, have a potent deterrent effect. And there always lurks the psychological deterrent of being branded a knowing violator of the law. This is particularly true in an industry where, as the sages put it, a good name is worth more than a crown. Cf. Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968).
 
 
 30
 Against any marginal deterrent effect which may result from adding the weapon of punitive damages to this already well-stocked arsenal, we must weigh the potentially awesome injuries that such damages may impose.[9] A violation of 17(a) is not often limited to a single purchaser. Rather, a misstatement in the prospectus or offering circular will harm nearly all those who read it. If all are permitted to recover not only compensatory damages but 'smart money' as well the sum of the liabilities could well bankrupt an otherwise honest underwriter or issuer who egregiously erred in one instance which affected many.
 
 
 31
 In Roginsky v. Richardson-Merrell Inc., 378 F.2d 832 (2d Cir. 1967) this court denied punitive damages in an action charging a drug manufacturer with irresponsibility in marketing a drug which injured hundreds of people. The opinion emphasized that punitive damages are normally awarded in situations where there is only a single injured party and thus the total amount of punitive damages may be kept to a reasonable level. A single misstatement or omission in a prospectus or offering circular, although less dangerous than a drug, may leave those responsible liable to literally thousands of purchasers.
 
 
 32
 Nor does there appear to be any way for us to fairly restrict the punitive award. It may not always be possible to circumscribe all possible plaintiffs in a single suit. Nor can we predict how many suits will arise from any particular violation. And, as Roginsky points out, 'We know of no principle whereby the first punitive award exhausts all claims for punitive damages and would thus preclude future judgments.' 378 F.2d at 839. Even if such a principle were valid we would have some doubt about the propriety of providing a windfall to the first litigant to chance upon a sympathetic jury.[10]
 
 
 33
 Finally, to permit punitive damages under the 1933 Act would create an unfortunate dichotomy between the 1933 and 1934 Acts. Section 28(a) of the 1934 Act prohibits punitive damages in actions brought under that Act.[11] But the 1934 Act is the only basis upon which defrauded sellers of securities could obtain relief, see Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962); 17(a) of the 1933 Act by its terms only provides protection to purchasers of stock who are damaged by fraud. Allowing exemplary damages under the 1933 but not under the 1934 Act would create an unreasoned split between buyers and sellers of securities subjected to fraud of an equally heinous nature.
 
 
 34
 To avoid such inconsistencies, courts have endeavored to treat the '33 and '34 Acts in pari materia and to construe them as a single comprehensive scheme of regulation. United States v. Morgan, 118 F.Supp. 621, 691 (S.D.N.Y.1953); Brown v. Gilligan, Will & Co., 287 F.Supp. 766, 775 (S.D.N.Y.1968); Rosenberg v. Globe Aircraft Corp., 80 F.Supp. 123 (E.D.Pa.1948); Lennerth v. Mendenhall, 234 F.Supp. 59, 62 (N.D.Ohio 1964). Professor Loss has written that the two statutes are 'as closely related as two nominally separate statutes could be.' 6 Loss, Securities Regulation 3915 (1969). Moreover, Sections 15(b)(5)-(7) and 15A(l)(1)-(2) of the 1934 Act make a broker-dealer's wilful violation of either act a ground for various administrative sanctions. And Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963) instructs 'the proper approach * * * is an analysis which reconciles the operation of both statutory schemes with another rather than holding one completely ousted.'[12] While we need not consider whether this close relationship affects other provisions of the two acts, it is undesirable and unnecessary to insert a wedge between innocent buyers and innocent sellers solely to provide yet another gram of deterrence.[13]
 
 III-- INDEMNITY
 
 35
 Judge Mansfield also granted the motion of LRS and Hoppenfeld to set aside the jury's verdict on the cross-claims granting indemnification to Blair. He thus struck down the indemnity agreement between the issuer and the underwriter, at least as it applied to the facts before us. Blair's cross-claim against LRS was based on a provision which compelled LRS to indemnify the underwriter for any loss arising out of an untrue statement of a material fact in the offering circular, except that Blair was not to obtain indemnification by reason of any wilful misfeasance, bad faith or gross negligence in the performance of its duties or by reason of its reckless disregard of its obligations under the agreement.[14] Its claim against Hoppenfeld and Wiener, who did not sign the indemnification agreement in their personal capacities rests on the theory that they were 'active' wrongdoers while Blair was merely a 'passive' joint tortfeasor.
 
 
 36
 The jury, by awarding compensatory and punitive damages to the plaintiffs under sections 17(a) and 10(b), necessarily found in light of the judge's charge, that Blair had actual knowledge of the material misstatements.[15] Cf. Fischman v. Raytheon Mfg. Co., supra; Thiele v. Shields, supra. Accordingly the court had ample basis to find Blair not deserving of recovery under the indemnity agreement itself. See 44 N.Y.U.L.Rev. 226, 227 (1969). But it chose instead the broader ground that where there is actual knowledge of the misstatement by the underwriter and wanton indifference by Blair to its obligations, 'it would be against the public policy embodied in the federal securities legislation to permit Blair and Co. * * * to enforce its indemnification agreement.' 287 F.Supp. at 199. Thus it is important to emphasize at the outset that at this time we consider only the case where the underwriter has committed a sin graver than ordinary negligence.
 
 
 37
 Given this state of the record, we concur in Judge Mansfield's ruling that to tolerate indemnity under these circumstances would encourage flouting the policy of the common law and the Securities Act. It is well established that one cannot insure himself against his own reckless, wilful or criminal misconduct. See Kansas City Operating Co. v. Durwood, 278 F.2d 354 (8th Cir. 1960); cf. Holman v. Johnson, 1 Cowper 341, 343, 98 Eng.Rep. 1120, 1121; Prosser, Torts, 48 (3d ed. 1964). See also 6 Loss at 3980.
 
 
 38
 Although the 1933 Act does not deal expressly with the question before us, provisions in that Act confirm our conclusion that Blair should not be entitled to indemnity from LRS. See generally Note, Indemnification of Underwriters and 11 of the Securities Act of 1933, 72 Yale L.J. 406. For example, 11 of the Act, 15 U.S.C. 77k, makes underwriters jointly liable with directors, experts and signers of the registration statement.[16] And, the SEC has announced its view that indemnification of directors, officers and controlling persons for liabilities arising under the 1933 Act is against the public policy of the Act. 17 C.F.R. 230.460. If we follow the syllogism through to its conclusion, underwriters should be treated equally with controlling persons and hence prohibited from obtaining indemnity from the issuer. See 72 Yale, supra, at 411. But see 3 Loss supra, at 1834 (1961).
 
 
 39
 Civil liability under section 11 and similar provisions was designed not so much to compensate the defrauded purchaser as to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties. And Congress intended to impose a 'high standard of trusteeship' on underwriters. Kroll, supra, at 687. Thus, what Professor Loss terms the 'in terrorem effect' of civil liability, 3 Loss, supra, at 1831, might well be thwarted if underwriters were free to pass their liability on to the issuer. Underwriters who knew they could be indemnified simply by showing that the issuer was 'more liable' than they (a process not too difficult when the issuer is inevitably closer to the facts) would have a tendency to be lax in their independent investigations. Cf. New York Central RR v. Lockwood, 84 U.S. (17 Wall.) 357, 377-378, 21 L.Ed. 627 (1873). Cases upholding indemnity for negligence in other fields are not necessarily apposite. The goal in such cases is to compensate the injured party. But the Securities Act is more concerned with prevention than cure.
 
 
 40
 Finally, it has been suggested that indemnification of the underwriter by the issuer is particularly suspect. Although in form the underwriter is reimbursed by the issuer, the recovery ultimately comes out of the pockets of the issuer's stockholders. Many of these stockholders may be the very purchasers to whom the underwriter should have been initially liable. The 1933 Act prohibits agreements with purchasers which purport to exempt individuals from liability arising under the Act. 15 U.S.C. 77n; see 82 Harv.L.Rev., supra, at 958. The situation before us is at least reminiscent of the evil this section was designed to avoid. But see Note, Indemnification of Underwriters, supra, 72 Yale L.J. at 408.
 
 
 41
 To turn briefly to the question of the cross-claim against Hoppenfeld and the third party claim against Wiener, similar reasoning supports Judge Mansfield's decision to grant judgment n.o.v. Blair may have been less active than Hoppenfeld, but since it had actual knowledge of the omitted facts and failed to take corrective action, it would be incongruous to permit it to recover over. Compare Burns v. Cunard SS Co., 404 F.2d 60 (2d Cir. 1968), cert. denied, 393 U.S. 1117, 89 S.Ct. 993, 22 L.Ed.2d 122.
 
 
 42
 Finally, there is no inconsistency between the policy prohibiting punitive damages and denying enforcement of indemnity agreements similar to the one here. The first avoids uncontrollable windfalls to a few plaintiffs and inconsistencies in the treatment of buyers and sellers. The latter policy ensures that an underwriter will not be able to increase the issuer's liability while totally avoiding any injury to himself. In both instances, the proper purpose of the Act is to encourage diligence, investigation and compliance with the requirements of the statute by exposing issuers and underwriters to the substantial hazard of liability for compensatory damages.
 
 IV-- THE JURY VERDICTS
 
 43
 Blair protests that the jury's verdict awarding damages because Blair acted with 'moral turpitude or wanton dishonesty,' 287 F.Supp. 194, is irreconcilable with the jury's verdict on the indemnity claim, in which the jury found for Blair after being told by the Judge that the underwriter could not recover if it was guilty of 'willful misfeasance, bad faith or gross negligence.' Accordingly Blair asks that new trials be granted on both issues. As a corollary, it contends that the jury verdict on the cross-claims bars the court from imputing to it anything more than ordinary negligence and thus the argument that indemnity is against public policy must fall.
 
 
 44
 Judge Mansfield rejected this construction of the jury verdicts and the accompanying demand for new trials. He reasoned that the jury was led by Blair's argument-- that LRS and Hoppenfeld were the primary wrongdoers-- into believing that its duty was to weigh the respective moral fault of each party. There was no need for a balancing of fault, the Judge held with respect to the indemnity claim. 287 F.Supp. at 199-200. The fact that the jury awarded considerably higher punitive damages against Hoppenfeld than against Blair supports Judge Mansfield's awareness of the jury's fascination with proportional guilt. The differences in the jury's verdict on punitive damages also illustrate that its view of the degree of inculpation of Blair, LRS and Hoppenfeld remained consistent throughout the trial of both the main claims and the cross-claims.
 
 
 45
 Blair's strategy in trying the case may have contributed to any confusion the jury may have experienced. The jury's consideration of the indemnity claim was deferred, quite appropriately, until it had considered and acted on the underlying question of violation by Blair and LRS of the securities acts. Judge Mansfield repeatedly cautioned the jury during the trial of this question that the cross-claims were not yet before it. It is of some interest that the Judge seemed to recognize that it might be wise to unburden the same jury from the difficult task of grappling with the cross-claims. As a result, after the first verdict was returned, the court suggested to Blair's counsel, Douglas M. Parker, Esq., that the cross-claims might best be tried to a referee, because if liability existed on the cross-claims, the question of damages would have to be handled by a referee in any case. Parker considered the court's proposal but elected to try the indemnity claim to the jury.
 
 
 46
 Blair's counsel then pursued the strategy of urging the jury to recognize that its determination of the indemnity claim was to be wholly independent of its findings on the first verdict. Parker began his presentation to the jury by candidly stating, 'I am, of course, disappointed in your decision * * * but now I ask you to turn to another and a different question, and that is the respective responsibility as between Blair and Company on the one hand and Law Research and Mr. Hoppenfeld and Mr. Wiener on the other hand.' Later on, he remarked, 'By your verdict today as I mentioned before, you indicated that you found that Blair did have a responsibility that it failed to meet in this case. While I may disagree with your judgment, I must of course accept it and nothing I'm saying now is arguing against that.' In any event, viewed in the context in which it arose, the jury's verdict on indemnity is not necessarily inconsistent with the initial verdict on the issue of liability.[17]
 
 V-- INTENT TO DEFRAUD
 
 47
 The jury was told that before the appellants could be held liable to plaintiffs, it must conclude that appellants 'knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading.' The trial court thus shared the view often advanced in this circuit that some form of scienter greater than mere negligence was required in order to permit plaintiffs to recover damages in a private action under 17(a) or 10(b). Cf., e.g., Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967). Hanly v. SEC, 415 F.2d 589 (2d Cir. 1969). But the trial judge refused to direct the jury that it must find appellants intended to defraud appellees before it determined that there was a violation of either of those sections.
 
 
 48
 The necessity of some intent to defraud or scienter has been the subject of much debate. See, e.g., SEC v. Van Horn, 371 F.2d 181, 185 (7th Cir. 1966); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Royal Air Properties Inc. v. Smith, supra; Fishman v. Raytheon Mfg. Co., supra; Weber v. C.M.P. Corp., 242 F.Supp. 321 (S.D.N.Y.1965); Bromberg, Securities Law, 2.6(1), 2.7(1); 6 Loss, supra, at 3552-3553, 3883-3888. But the trend is clearly away from enforcing a scienter requirement equal to the 'intent to defraud' required for common law fraud. Before there may be a violation of the securities acts there need not be present all of the same elements essential to a common law fraud, see SEC v. Great American Industries, Inc., 407 F.2d 453, 463, cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (my concurring opinion).
 
 
 49
 Judge Mansfield's charge clearly required a finding of scienter, albeit not using the magic words 'intent to defraud.' In Heit v. Weitzen, 402 F.2d 909, 914 (2d Cir. 1968) this court concluded that an allegation of actual knowledge of falsity is amply sufficient as a matter of pleading to state a claim upon which relief could be granted under 10b-5. See also United States v. Benjamin, 328 F.2d 854, 862-863 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1954). In this case there was an accusation of actual knowledge; there was also sufficient evidence to sustain the jury's finding of knowledge and in addition, that the appellants were guilty of 'high moral culpability.'[18] Thus, whatever the outcome of the great debate over ordinary negligence versus scienter in private actions under 10(b) and Rule 10b-5, see SEC v. Texas Gulf Sulphur, supra, and the concurring opinions, it is clear that Judge Mansfield's instruction satisfied the scienter requirement imposed by prior cases.
 
 VI-- CAUSATION
 
 50
 As is to be expected in difficult cases, appellants have urged a variety of arguments directed at the legion of rulings made during the course of the trial. Only a few of these merit discussion. Thus, appellants charge the jury was not properly charged on the element of causation in a violation of 17(a) or 10(b) and Rule 10b-5 and, concomitantly that there was insufficient evidence to show the misleading statement in question caused plaintiffs' losses. In essence, appellants assert that appellees must prove not only that the misleading statement caused them to purchase LRS stock but that the statement caused their economic loss by directly affecting the market price of LRS stock. It is interesting to note that the price of LRS began its decline after April 7, the date the SEC contracted Nixon Mudge and the Sperry Rand contract termination became more widely known.
 
 
 51
 It is sufficient for our purposes to recall that the court gave the jury clear instructions on causation. Thus he instructed
 
 
 52
 'the plaintiff is required to prove by a fair preponderance of the evidence that he or she suffered damages as a proximate result of the alleged misleading statements and purchase of stock in reliance to them. In other words, the plaintiff must show that the misleading statement or omission played a substantial part in bringing about or causing the damage suffered by him or her and that the damage was either a direct result or a reasonably foreseeable result of the misleading statement.'
 
 
 53
 Moreover, the jury was told to consider all the factors surrounding the misrepresentation in deciding if the plaintiffs' losses were caused by the misstatement. Because plaintiffs testified that they purchased the stock after being attracted by the name Sperry Rand in the offering circular and since the jury could have inferred that the price of the stock was bloated by the failure to disclose the true relationship between Sperry Rand and LRS, there was sufficient evidence to support a finding of causal relationship between the misrepresentation and the losses appellees incurred when they sold. Compare List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Given this evidence, the jury could appropriately find the causal link. See Prosser, Torts 244 (3d ed.1964). The instructions were sufficient to bring home the basic concept that causation must be proved else defendants could be held liable to all the world. Cf. Bromberg, supra, 817. See also Vine v. Beneficial Finance Co., Inc., 374 F.2d 627, 635 (2d Cir.), cert. denied,389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); Mutual Shares Corp. v. Genesco Inc., 384 F.2d 540, 544 (2d Cir. 1967); Barnett v. Anaconda Co.,238 F.Supp. 766, 776 (S.D.N.Y.1965); 6 Loss, supra, at 3880-3881.
 
 
 54
 Appellants also argue that the court distorted the question of causation by ruling that the schedule which the parties agreed would govern the amount of compensatory damages suffered assuming liability was proven, estopped defendants from contending that Globus (and perhaps others) suffered no actual loss since in Globus' case the stock was sold solely for the purpose of obtaining a tax loss. But, Judge Mansfield was correct in stating the issue to the extent of the loss the plaintiffs suffered as a result of their sale, not whether subsequent transactions in the stock led to a profit. Any other concept would prevent one from suing an issuer of stock even for the most flagrant violations. Globus' repurchase and admission that he sold for tax reasons was quite relevant to the issue of causation; but Judge Mansfield properly instructed the jury on that score.
 
 VII-- REMEDY
 
 55
 We have carefully examined all the other points raised by appellants, relating to damages, replacement of counsel, etc. To avoid further extending this opinion already necessarily protracted because of the novel and important questions raised on this appeal, it is sufficient to state they have been carefully considered and we are in agreement with the determinations made by the able and experienced judge who presided over this difficult litigation.
 
 
 56
 In sum, we affirm the judgment below in all respects except the award of punitive damages on which we reverse.[19]
 
 
 
 [1]
 Section 17(a) of the Securities Act of 1933 reads:
 (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly--
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. And, Section 10(b) of the Securities Exchange Act of 1934 reads:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Rule 10b-5, 17 C.F.R. 240.10b-5, is virtually identical to 17(a) except that the statutory provision applies only to the conduct of sellers, while the rule governs the conduct of both buyers and sellers. See 3 Loss, Securities Regulation 1424-25 (1961).
 
 
 [2]
 Regulation A of the 1933 Act permits an issuer of stock to make a small public offering without filing the complex and lengthy registration statement and prospectus normally required by law. Nonetheless, the issuer must still submit to the SEC an offering circular containing basic information about the stock and its issuer. After review by the SEC the offering circular is distributed to prospective purchasers of the stock. See 17 C.F.R. 230.251-62
 
 
 [3]
 Blair was also charged with a violation of 12(1) of the 1933 Act, 15 U.S.C. 77l(1), but plaintiffs consented to the dismissal of this count
 
 
 [4]
 Hence Hoppenfeld testified that he believed Murdock could not effectively revoke the contract without Sullivan's consent. Sullivan testified at trial, however, that the letter had been sent with his knowledge and consent
 
 
 [5]
 Since the LRS tapes could be used on any Univac III computer, several of which were accessible in the New York area, Hoppenfeld testified that he did not believe Sperry Rand's action detrimentally affected the future of LRS. However, many plaintiffs indicated that what impressed them in the offering circular was not merely the use of Univac computers but the prestige of Sperry Rand's name
 
 
 [6]
 LRS also borrowed $125,000 at 6% From the Franklin National Bank and sold $125,000 in 8% Debentures to the Franklin Corporation, a small business investment company connected with the bank. Thus the total raised was $510,000 of which $82,285 was earmarked for the Sperry Rand debt. Most of the remainder was to be devoted to indexing the decisions of the federal courts, a project which would cost $445,000
 
 
 [7]
 The letter reads as follows:
 LAW RESEARCH SERVICE, INC.
 1290 Avenue of the Americas New York, New York
 REPORT FROM THE PRESIDENT
 Negotiations with Sperry Rand Corporation have been consummated resulting in amendments to this Company's contract with Sperry Rand, which continues to run for five years from June 5, 1963, and was the subject of certain differences including the assertion by Sperry Rand that it had been terminated. These differences antedated the recent Offering Circular of this Company and were not referred to therein. Among the amendments to the contract is a provision for deposits of $10,000 by this Company with Sperry Rand for new programming or other services to be rendered by them, and a provision for termination of the contract by Sperry Rand, upon 30 days notice, for default. In connection with the negotiations this Company's lawsuit against Sperry Rand has been discontinued.
 Herman E. Goodman, President of The Franklin Corporation, and Malcolm D. Sanders, a Vice President of Blair & Co., Granbery, Marache Incorporated, have been elected directors of Law Research Service, Inc. which now has a four-man Board.
 April 22, 1965
 signed/ ELLIAS C. HOPPENFELD Ellias C. Hoppenfeld President
 
 
 [8]
 The present suit was initiated as a class action. However, on May 2, 1967, Judge Frankel determined that the action could not be maintained as a class action. The record before us does not indicate the reasons for Judge Frankel's decision. Nor have plaintiffs appealed from this order. Opinions subsequent to his decision have broadened the scope of class actions under Fed.R.Civ.P. 23. Green v. Wolf Corp., supra; Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968)
 
 
 [9]
 See Green v. Wolf, supra, 406 F.2d at 303, n. 18; e.g., Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1957) ($3 million in punitive damages reduced by the court to $460,000)
 
 
 [10]
 It is true that in the instant case, the jury was quite moderate in its award of punitive damages, and specifically refrained from awarding punitive damages against LRS, in which case the damages would really have fallen in part on innocent stockholders. Nonetheless, the danger of overkill would clearly be present in future actions under 17(a). The interests of justice are clearly served by announcing the rule we consider appropriate for all cases under this section
 
 
 [11]
 Blair and Hoppenfeld argue that 28(a) also prohibits punitive damages regardless of the theory on which they are based in any suit in which a claim for damages under the 1934 Act is made. They rely on that sentence in 28(a) which reads 'no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages * * *.' Cf. Pappas v. Moss, 257 F.Supp. 345, 364 (D.N.J.1968), rev'd on other grounds, 393 F.2d 865 (3d Cir. 1968). We need not reach this question since we have found that 17(a) of the 1933 Act does not support punitive damages for several reasons. Because the jury found the defendants not liable on the common law fraud count, we also do not reach the question whether 28(a) would prohibit punitive damages in an action for common law fraud joined to an action based on the 1934 Act
 
 
 [12]
 Our opinion in Green v. Wolf Corp., supra, does contain some language indicating such a dichotomy does exist and that punitive damages may be permissible under the 1933 Act. 406 F.2d at 303. However it is obvious to the careful reader that this was merely dicta intended to limit the holding in Green to the specific issue then before the court, i.e., the validity of punitive damages in an action based on 10(b) and Rule 10b-5 of the 1934 Act and not as approval for the award of punitive damages under the 1933 Act. As we have demonstrated, supra, the reasoning of Green is completely consistent with our holding here. As to the legislative history on which Judge Mansfield purported to base the discrepancy between the two acts, see 54 Va.L.Rev. 1560 (1968)
 
 
 [13]
 Because we conclude 17(a) of the 1933 Act will not sustain an award of punitive damages, we also avoid the need to decide which law of punitive damages applies-- state or federal common law or perhaps federal law incorporating state law. This conundrum has vexed the commentators. Compare 82 Harv.L.Rev. at 956 with 44 N.Y.U.L.Rev. at 234. If for example state law applied and some states permitted recovery of punitive damages while others did not, it would result in 'varied protection for the same federal right.' 82 Harv.L.Rev. at 956
 
 
 [14]
 The text of the indemnity clause reads:
 Indemnification. (a) The Company will indemnify and hold you harmless and each person, if any, who controls you within the meaning of the Securities Act, against any losses, claims, damages or liabilities, joint or several, to which you, or any such controlling person, may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Notification, the Offering Circular, or any amendment or supplement thereto, or arise out of or are based upon the omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; and will reimburse you and each such controlling person for any legal or other expenses reasonably incurred by you or such controlling person in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Notification or the Offering Circular or such amendment or such supplement, in reliance upon and in conformity with written information furnished to the Company by you specifically for use in the preparation thereof and provided, further, that neither this indemnity agreement nor any of the representations or other warranties of the Company contained herein, to the extent that such agreement or any such representation or warranty requires the Company to indemnify and hold harmless against liabilities arising under the Securities Act any controlling person of or any director, officer or partner of Blair & Co., Granbery, Marache Incorporated who, when the Notification becomes effective, is also a director of the Company, or whose election as a director of the Company upon completion of the current offering is anticipated at the time the Notification becomes effective, shall inure to the benefit of any such controlling person, director, officer or partner unless a court of competent jurisdiction shall have determined that such indemnification is not against public policy as expressed in the Securities Act. The Company shall not be required to indemnify you or any such controlling person for any payment made to any claimant in settlement of any suit or claim unless such payment is approved by the Company or by a court having jurisdiction of the controversy. Anything to the contrary in this Agreement notwithstanding, nothing herein shall protect or purport to protect you against any liability to the Company or its security holders to which you would otherwise be subject by reason of willful misfeasance, bad faith, or gross negligence in the performance of your duties or by reason of your reckless disregard of your obligations and duties under this Agreement. This indemnity agreement will be in addition to any liability which the Company may otherwise have.
 
 
 [15]
 The matter of a possible inconsistency between the verdict finding Blair liable to appellees and the verdict awarding Blair indemnity is considered infra at Part IV
 
 
 [16]
 11 applies to full registrations. LRS's issue was under Regulation A. Compare 44 N.Y.U.L.Rev. at 229 n. 34 with Kroll, Some Reflections on Indemnification Provisions & S.E.C. Liability Insurance in the Light of BarChris and Globus, 24 Bus.L. 685 (1969)
 
 
 [17]
 It has been said again and again, in civil as well as criminal cases such as Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) that consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment. 'If there be an inconsistency in the verdicts which might have justified a trial court in granting a new trial, it may nonetheless stand on appeal even though inconsistent. That is the jury's prerogative.' Int'l Longshoremen's & Warehousemen's Local 8 v. Hawaiian Pineapple Co., 226 F.2d 875, 881 (9th Cir. 1955), cert. denied 351 U.S. 963, 76 S.Ct. 1026, 100 L.Ed. 1483 (1956). See also Jayne v. Mason and Dixon Lines, 124 F.2d 317, 319 (2d Cir. 1941); Malm v. United States Lines Co., 269 F.Supp. 731 (S.D.N.Y.), affd. per cur. 378 F.2d 941 (2d Cir. 1967). Although Blair asserts that the cases cited by its opponents are not in point because the opinions attempted to reconcile the verdicts, it is difficult to distinguish the case at bar, in which the jury's attitude towards the defendants remained consistent throughout and, in addition, where any alleged confusion by the jury was aided and abetted by Blair
 
 
 [18]
 Because we have concluded as a matter of law that punitive damages are not available for violations under 17(a), we obviously need not determine if the evidence was sufficient to sustain the award of punitive damages. Rather we intend to indicate only that there was a surfeit of proof on the intentional nature of the violation
 
 
 [19]
 We do not believe the issue of punitive damages so permeated the record to the substantial prejudice of the appellants as to require a new trial on either the main issue of liability or the cross-claims for indemnity. Moreover, in accordance with Fed.R.App.P. 39(a) the parties will bear their own costs on appeal